# NORTHEASTERN FLORIDA CHAPTER OF THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA *v.* CITY OF JACKSONVILLE, FLORIDA, ET AL.

No. 91–1721.   Argued February 22, 1993—Decided June 14, 1993

*Deborah A. Ausburn* argued the cause for petitioner. With her on the briefs was *G. Stephen Parker.*

*Leonard S. Magid* argued the cause for respondents. With him on the brief were *Charles W. Arnold, Jr.,* and *Steven E. Rohan.**

---

*Briefs of *amici curiae* urging reversal were filed for the Associated General Contractors of America, Inc., by *Walter H. Ryland* and *Michael E. Kennedy;* for the Equal Rights Advocates et al. by *Curtis E. A. Karnow, Judith Kurtz, Eva Jefferson Paterson, Antonia Hernandez,* and *William C. McNeill III;* for the Pacific Legal Foundation et al. by *John*

JUSTICE THOMAS delivered the opinion of the Court.

A Jacksonville, Florida, ordinance accords preferential treatment to certain minority-owned businesses in the award of city contracts.   In this case we decide whether, in order to have standing to challenge the ordinance, an association of contractors is required to show that one of its members would have received a contract absent the ordinance.   We hold that it is not.

I

A

In 1984, respondent Jacksonville enacted an ordinance entitled "Minority Business Enterprise Participation," which required that 10% of the amount spent on city contracts be set aside each fiscal year for so-called "Minority Business Enterprises" (MBE's).   City of Jacksonville Purchasing Code §§ 126.604(a), 126.605(a) (1988).   An MBE was defined as a business whose ownership was at least 51% "minority" or female, § 126.603(a), and a "minority" was in turn defined as a person who is or considers himself to be black, Spanish-speaking, Oriental, Indian, Eskimo, Aleut, or handicapped, § 126.603(b).   Once projects were earmarked for MBE bidding by the city's chief purchasing officer, they were "deemed reserved for minority business enterprises only." §§ 126.604(c), 126.605(c).   Under the ordinance, "[m]athematical certainty [was] not required in determining the amount of the set aside," but the chief purchasing officer was required to "make every attempt to come as close as possible to

H. Findley, Ronald A. Zumbrun, and James W. Polk; and for Public Citizen et al. by Paul R. Q. Wolfson, Alan B. Morrison, John A. Powell, and Steven R. Shapiro.

Richard Ruda filed a brief for the National League of Cities et al. as amici curiae urging affirmance.

Lee Fisher, Attorney General of Ohio, Andrew I. Sutter, Assistant Attorney General, and Frank J. Kelley, Attorney General of Michigan, filed a brief for the State of Ohio et al. as amici curiae.

the ten percent figure." §§ 126.604(a)(4), 126.605(a)(4). The ordinance also provided for waiver or reduction of the 10% set-aside under certain circumstances. § 126.608.

Petitioner, the Northeastern Florida Chapter of the Associated General Contractors of America (AGC), is an association of individuals and firms in the construction industry. Petitioner's members do business in Jacksonville, and most of them do not qualify as MBE's under the city's ordinance. On April 4, 1989, petitioner filed an action, pursuant to 42 U. S. C. § 1983, against the city and its mayor (also a respondent here) in the United States District Court for the Middle District of Florida. Claiming that Jacksonville's ordinance violated the Equal Protection Clause of the Fourteenth Amendment (both on its face and as applied), petitioner sought declaratory and injunctive relief. In its complaint, petitioner alleged that many of its members "regularly bid on and perform construction work for the City of Jacksonville," Complaint ¶ 9, and that they "would have . . . bid on . . . designated set aside contracts but for the restrictions imposed" by the ordinance, *id.*, ¶ 46.

On April 6, 1989, the District Court entered a temporary restraining order prohibiting the city from implementing the MBE ordinance, and, on April 20, it issued a preliminary injunction. Respondents appealed. Concluding that petitioner had not demonstrated irreparable injury, the Court of Appeals reversed the issuance of the preliminary injunction, and remanded the case for an expedited disposition on the merits. 896 F. 2d 1283 (CA11 1990). Chief Judge Tjoflat concurred in the judgment. In his view the suit should have been dismissed for lack of standing, because petitioner's complaint did not "refer to any specific contract or subcontract that would have been awarded to a nonminority bidder but for the set-aside ordinance." *Id.*, at 1287.

In the meantime, both petitioner and respondents had moved for summary judgment.[1] On May 31, 1990, the District Court entered summary judgment for petitioner, concluding that the MBE ordinance was inconsistent with the equal protection criteria established by this Court in *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989). Once again respondents appealed, and once again they obtained a favorable ruling. 951 F. 2d 1217 (1992). Rather than addressing the merits of petitioner's equal protection claim, the Court of Appeals held that petitioner "lacks standing to challenge the ordinance establishing the set-aside program," *id.*, at 1218, because it "has not demonstrated that, but for the program, any AGC member would have bid successfully for any of these contracts," *id.*, at 1219. The Court of Appeals accordingly vacated the District Court's judgment, and remanded the case with instructions to dismiss petitioner's complaint without prejudice.

Because the Eleventh Circuit's decision conflicts with decisions of the District of Columbia Circuit and the Ninth Circuit, see *O'Donnell Constr. Co.* v. *District of Columbia*, 295 U. S. App. D. C. 317, 320, 963 F. 2d 420, 423 (1992); *Coral Constr. Co.* v. *King County*, 941 F. 2d 910, 930 (CA9 1991), cert. denied, 502 U. S. 1033 (1992), we granted certiorari. 506 U. S. 813 (1992).

B

On October 27, 1992, 22 days after our grant of certiorari, the city repealed its MBE ordinance and replaced it with an ordinance entitled "African-American and Women's Business Enterprise Participation," which became effective the next day. This ordinance differs from the repealed ordinance in three principal respects. First, unlike the prior ordinance,

---

[1] In their motion for summary judgment, respondents claimed only that they were entitled to judgment as a matter of law on the merits; they did not challenge petitioner's standing. See 2 Record, Exh. 33.

which applied to women and members of seven different minority groups, the new ordinance applies only to women and blacks. Jacksonville Purchasing Code § 126.601(b) (1992). Second, rather than a 10% "set aside," the new ordinance has established "participation goals" ranging from 5 to 16%, depending upon the type of contract, the ownership of the contractor, and the fiscal year in which the contract is awarded. § 126.604. Third, the new ordinance provides not one but five alternative methods for achieving the "participation goals." · §§ 126.605, 126.618. Which of these methods the city will use is decided on a "project by project basis," § 126.605, but one of them, the "Sheltered Market Plan," is (apart from the percentages) virtually identical to the prior ordinance's "set aside." Under this plan, certain contracts are reserved "for the exclusive competition" of certified black- and female-owned businesses. § 126.605(b).[2]

Claiming that there was no longer a live controversy with respect to the constitutionality of the repealed ordinance, respondents filed a motion to dismiss the case as moot on November 18, 1992. We denied that motion on December 14. 506 U. S. 1031 (1992).

## II

In their brief on the merits, respondents reassert their claim that the repeal of the challenged ordinance renders the case moot. We decline to disturb our earlier ruling, however; now, as then, the mootness question is controlled by

---

[2] The four other methods are (1) a "Participation Percentage Plan," under which contractors are required to subcontract with black- or female-owned businesses, §§ 126.605(a), 126.612; (2) a "Direct Negotiation Plan," pursuant to which the city engages in "direct negotiations" with black- or female-owned businesses, § 126.605(c); (3) a "Bid Preference Plan," which provides for the award of a contract to the black- or female-owned business whose bid is within a certain percentage or dollar amount of the lowest bid, § 126.605(d); and (4) an "Impact Plan," under which "point values" are awarded to black- and female-owned businesses and to businesses that use black- or female-owned subcontractors or suppliers or have a specified employment program for black and female employees, § 126.618.

*City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283 (1982), where we applied the "well settled" rule that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.*, at 289. Although the challenged statutory language at issue in *City of Mesquite* had been eliminated while the case was pending in the Court of Appeals, we held that the case was not moot, because the defendant's "repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Ibid.*

This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. Nor does it matter that the new ordinance differs in certain respects from the old one. *City of Mesquite* does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors— and, in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—it disadvantages them in the same fundamental way.[3]

---

[3] At bottom, the dissent differs with us only over the question whether the new ordinance is sufficiently similar to the repealed ordinance that it is permissible to say that the challenged conduct continues—or, as the dissent puts it, whether the ordinance has been "sufficiently altered so as to present a substantially different controversy from the one the District Court originally decided." *Post,* at 671. We believe that the ordinance has not been "sufficiently altered"; the dissent disagrees. As for the merits of that disagreement, the short answer to the dissent's argument that this case is controlled by *Diffenderfer* v. *Central Baptist Church of Miami,*

We hold that the case is not moot, and we now turn to the question on which we granted certiorari: whether petitioner has standing to challenge Jacksonville's ordinance.

## III

The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992), which itself "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded," *Allen* v. *Wright*, 468 U. S. 737, 750 (1984). It has been established by a long line of cases that a party seeking to invoke a federal court's jurisdiction must demonstrate three things: (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan, supra*, at 560 (citations, footnote, and internal quotation marks omitted); (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court," *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S. 26, 41–42 (1976); and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from

*Inc.*, 404 U. S. 412 (1972) *(per curiam)*, and *Fusari* v. *Steinberg*, 419 U. S. 379 (1975)—both of which predate *City of Mesquite*—is that the statutes at issue in those cases were changed substantially, and that there was therefore no basis for concluding that the challenged conduct was being repeated. See *Diffenderfer, supra*, at 413–414 ("crux of [the] complaint" was that old statute violated Constitution insofar as it authorized tax exemption "for church property used primarily for commercial purposes"; new statute authorized exemption "only if the property is used predominantly for religious purposes"); *Fusari*, 419 U. S., at 380 (challenged statute was "significantly revised"); *id.*, at 385 (legislature enacted "major revisions" of statute).

the injury as a result of a favorable ruling" is not "too speculative," *Allen* v. *Wright, supra,* at 752. These elements are the "irreducible minimum," *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 472 (1982), required by the Constitution.

The Court of Appeals held that petitioner could not establish standing because it failed to allege that one or more of its members would have been awarded a contract but for the challenged ordinance. Under these circumstances, the Court of Appeals concluded, there is no "injury." 951 F. 2d, at 1219–1220. This holding cannot be reconciled with our precedents.

## A

In *Turner* v. *Fouche,* 396 U. S. 346 (1970), a Georgia law limiting school board membership to property owners was challenged on equal protection grounds. We held that a plaintiff who did not own property had standing to challenge the law, *id.,* at 361, n. 23, and although we did not say so explicitly, our holding did not depend upon an allegation that he would have been appointed to the board but for the property requirement. All that was necessary was that the plaintiff wished to be considered for the position. Accord, *Quinn* v. *Millsap,* 491 U. S. 95, 103 (1989) (plaintiffs who do not own real property have standing to challenge property requirement for membership on "board of freeholders").

We confronted a similar issue in *Clements* v. *Fashing,* 457 U. S. 957 (1982). There, a number of officeholders claimed that their equal protection rights were violated by the "automatic resignation" provision of the Texas Constitution, which requires the immediate resignation of some (but not all) state officeholders upon their announcement of a candidacy for another office. Noting that the plaintiffs had alleged that they would have announced their candidacy were it not for the consequences of doing so, we rejected the claim that the dispute was "merely hypothetical," and that the allegations were insufficient to create an "actual case or contro-

versy." *Id.*, at 962. Citing *Turner* v. *Fouche*, we emphasized that the plaintiffs' injury was the "obstacle to [their] *candidacy*," 457 U. S., at 962 (emphasis added); we did not require any allegation that the plaintiffs would actually have been elected but for the prohibition.

The decision that is most closely analogous to this case, however, is *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978), where a twice-rejected white male applicant claimed that a medical school's admissions program, which reserved 16 of the 100 places in the entering class for minority applicants, was inconsistent with the Equal Protection Clause. Addressing the argument that the applicant lacked standing to challenge the program, Justice Powell concluded that the "constitutional requirements of Art. III" had been satisfied, because the requisite "injury" was the medical school's "decision not to permit Bakke to *compete* for all 100 places in the class, simply because of his race." *Id.*, at 281, n. 14 (emphasis added) (principal opinion). Thus, "even if Bakke had been unable to prove that he would have been *admitted* in the absence of the special program, it would not follow that he lacked standing." *Id.*, at 280–281, n. 14 (emphasis added). This portion of Justice Powell's opinion was joined by four other Justices. See *id.*, at 272.[4]

---

[4] Although *Bakke* came to us from state court, our decision in *ASARCO Inc.* v. *Kadish*, 490 U. S. 605 (1989), does not retroactively render *Bakke's* discussion of standing dictum. See Brief for Public Citizen et al. as *Amici Curiae* 7, n. 4 (suggesting that it might). In *ASARCO* we held that we had jurisdiction to review the judgment of a state court even though the respondents (plaintiffs in the trial court) "had no standing to sue under the principles governing the federal courts," 490 U. S., at 623, because the petitioners (defendants in the trial court) "allege[d] a specific injury stemming from the state-court decree," *id.*, at 617. But we did not hold that it was *irrelevant* whether the state-court plaintiffs met federal standing requirements; instead we made it clear that a determination that the plaintiffs satisfied those requirements would have "obviated any further inquiry." *Id.*, at 623, n. 2. Thus, while *Bakke's* standing was not a necessary condition for our exercise of jurisdiction, it was sufficient.

Singly and collectively, these cases stand for the following proposition: When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. See, *e. g.,* *Turner* v. *Fouche, supra,* at 362 ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be *considered* for public service without the burden of invidiously discriminatory disqualifications") (footnote omitted) (emphasis added). And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. See *Croson,* 488 U. S., at 493 (principal opinion of O'CONNOR, J.) ("The [set-aside program] denies certain citizens the *opportunity to compete* for a fixed percentage of public contracts based solely upon their race") (emphasis added). To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.[5]

### B

In urging affirmance, respondents rely primarily upon *Warth* v. *Seldin,* 422 U. S. 490 (1975). There the plaintiffs claimed that a town's zoning ordinance, both by its terms and as enforced, violated the Fourteenth Amendment insofar as

---

[5] It follows from our definition of "injury in fact" that petitioner has sufficiently alleged both that the city's ordinance is the "cause" of its injury and that a judicial decree directing the city to discontinue its program would "redress" the injury.

it had the effect of preventing people of low and moderate income from living in the town. Seeking to intervene in the suit, an association of construction firms alleged that the zoning restrictions had deprived some of its members of business opportunities and profits. We held that the association lacked standing, and we provided the following explanation for our holding:

> "The complaint refers to no specific project of any of [the association's] members that is currently precluded either by the ordinance or by respondents' action in enforcing it. There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by [the association's] members, or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, [the association] has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention." *Id.*, at 516.

We think *Warth* is distinguishable. Unlike the other cases that we have discussed, *Warth* did not involve an allegation that some discriminatory classification prevented the plaintiff from competing on an equal footing in its quest for a benefit. In *Turner* v. *Fouche, Quinn* v. *Millsap,* and *Clements* v. *Fashing,* the plaintiffs complained that they could not be considered for public office. And in both *Bakke* and this case, the allegation was that the plaintiff (or the plaintiff's membership) was excluded from consideration for a certain portion of benefits—in *Bakke,* places in a medical school class; here, municipal contracts. In *Warth,* by contrast, there was no claim that the construction association's members could not apply for variances and building permits on the same basis as other firms; what the association objected

to were the "refusals by the town officials to *grant* variances and permits." 422 U. S., at 515 (emphasis added). See also *id.*, at 530 (Brennan, J., dissenting) ("[T]he claim is that respondents will not approve any project") (emphasis deleted). The firms' complaint, in other words, was not that they could not compete equally; it was that they did not win. Thus, while there is undoubtedly some tension between *Warth* and the aforementioned line of cases, this case is governed by the latter.

In any event, the tension is minimal. Even assuming that the alleged injury in *Warth* was an inability to *compete* for variances and permits on an equal basis, and that *Warth*, too, is analogous to this case, it is distinguishable nonetheless. Unlike petitioner, which alleged that its members regularly bid on contracts in Jacksonville and would bid on those that the city's ordinance makes unavailable to them, the construction association in *Warth* did not allege that "any member ha[d] applied . . . for a building permit or a variance with respect to any current project." *Id.*, at 516. Thus, unlike the association in *Warth*, petitioner has alleged an "injury . . . of sufficient immediacy . . . to warrant judicial intervention." *Ibid.* Furthermore, we did not hold in *Warth*, as the Court of Appeals—*mutatis mutandis*—did here, that the association was *required* to allege that but for a discriminatory policy, variances or permits would have been awarded to its members. An allegation that a "specific project" was "precluded" by the existence or administration of the zoning ordinance, *ibid.*, would certainly have been sufficient to establish standing, but there is no suggestion in *Warth* that it was necessary.

## IV

In its complaint, petitioner alleged that its members regularly bid on construction contracts in Jacksonville, and that they would have bid on contracts set aside pursuant to the city's ordinance were they so able. Complaint ¶¶ 9, 46. Because those allegations have not been challenged (by way of

a motion for summary judgment, for example), we must assume that they are true. See *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1012–1013, n. 3 (1992); *Pennell* v. *San Jose*, 485 U. S. 1, 7 (1988). Given that assumption, and given the legal standard we have reaffirmed today, it was inappropriate for the Court of Appeals to order that petitioner's complaint be dismissed for lack of standing.[6] The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, dissenting.

When a challenged statute expires or is repealed or significantly amended pending review, and the only relief sought is prospective, the Court's practice has been to dismiss the case as moot. Today the Court abandons that practice, relying solely on our decision in *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283 (1982). See *ante*, at 661–663. I believe this case more closely resembles those cases in which we have found mootness than it does *City of Mesquite*. Accordingly, I would not reach the standing question decided by the majority.

I

A

Earlier this Term, the Court reaffirmed the longstanding rule that a case must be dismissed as moot "if an event occurs [pending review] that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party."

---

[6] There has been no suggestion that even if petitioner's members have standing to sue, petitioner itself does not, because one or more of the prerequisites to "associational standing" have not been satisfied. See *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977). Nor, given the current state of the record, do we have any basis for reaching that conclusion on our own.

*Church of Scientology of Cal.* v. *United States,* 506 U. S. 9, 12 (1992) (quoting *Mills* v. *Green,* 159 U. S. 651, 653 (1895)). That principle applies to challenges to legislation that has expired or has been repealed, where the plaintiff has sought only prospective relief. If the challenged statute no longer exists, there ordinarily can be no real controversy as to its continuing validity, and an order enjoining its enforcement would be meaningless. In such circumstances, it is well settled that the case should be dismissed as moot. See, *e. g., New Orleans Flour Inspectors* v. *Glover,* 160 U. S. 170 (1895) (repeal). Accord, *Burke* v. *Barnes,* 479 U. S. 361, 363–365 (1987) (expiration); cf. *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 478, n. 1 (1989) (expiration of set-aside law did not moot case where parties had continuing controversy over question whether prior application of ordinance entitled plaintiff to *damages*).

The analysis varies when the challenged statute is amended or is repealed but replaced with new legislation. I agree with the Court that a defendant cannot moot a case simply by altering the law "in some insignificant respect." *Ante,* at 662. We have recognized, however, that material changes may render a case moot. See, *e. g., Princeton Univ.* v. *Schmid,* 455 U. S. 100, 103 (1982) *(per curiam)* ("substantia[l] amend[ment]" of challenged regulation mooted controversy over its validity). It seems clear, for example, that when the challenged law is revised so as plainly to cure the alleged defect, or in such a way that the law no longer applies to the plaintiff, there is no live controversy for the Court to decide. Such cases functionally are indistinguishable from those involving outright repeal: Neither a declaration of the challenged statute's invalidity nor an injunction against its future enforcement would benefit the plaintiff, because the statute no longer can be said to affect the plaintiff. See, *e. g., Department of Treasury* v. *Galioto,* 477 U. S. 556, 559–560 (1986) (equal protection challenge to federal firearms statute treating certain felons more favorably than former

mental patients moot after Congress amended statute to eliminate discrimination); *Kremens* v. *Bartley*, 431 U. S. 119, 128–130 (1977) (challenge to law permitting parents to commit juveniles under 18 to mental hospital mooted, with respect to those over 13, by new legislation permitting such commitment only of juveniles 13 and under); *Board of Pub. Util. Comm'rs* v. *Compañia General De Tabacos De Filipinas*, 249 U. S. 425, 426 (1919) (challenge to statute alleged to constitute unlawful delegation of legislative power to regulatory board dismissed after statutory amendment detailed board's responsibilities); *Berry* v. *Davis*, 242 U. S. 468, 470 (1917) (suit to enjoin mandatory vasectomy on plaintiff dismissed after statute requiring operation was replaced by law inapplicable to plaintiff).

A more difficult question is presented when, after we have granted review of a case, the challenged statute is replaced with new legislation that, while not obviously or completely remedying the alleged infirmity in the original act, is more narrowly drawn. The new law ultimately may suffer from the same legal defect as the old. But the statute may be sufficiently altered so as to present a substantially different controversy from the one the district court originally decided. In such cases, this Court typically has exercised caution and treated the case as moot.

In *Diffenderfer* v. *Central Baptist Church of Miami, Inc.*, 404 U. S. 412 (1972) *(per curiam)*, for example, plaintiffs challenged a Florida statute that exempted from taxation certain church property used in part as a commercial parking lot as violative of the Religion Clauses of the First Amendment. After this Court noted probable jurisdiction, the Florida Legislature repealed the statute and replaced it with new legislation exempting from taxation only church property used predominantly for religious purposes. Observing that the church property in question might not be entitled to an exemption under the new law, we concluded that the controversy before us was moot. We reasoned:

> "The only relief sought in the complaint was a declaratory judgment that the now repealed [statute] is unconstitutional as applied to a church parking lot used for commercial purposes and an injunction against its application to said lot. This relief is, of course, inappropriate now that the statute has been repealed." *Id.*, at 414–415.

Recognizing that the plaintiffs might wish to challenge the newly enacted legislation, we declined simply to order dismissal, as is our practice when a controversy becomes moot pending a decision by this Court. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39, and n. 2 (1950). Instead, we vacated the lower court's judgment and remanded with leave to the plaintiffs to amend their pleadings. 404 U. S., at 415.

The Court took a similar approach in *Fusari* v. *Steinberg*, 419 U. S. 379 (1975), in which plaintiffs challenged Connecticut's procedures for determining continuing eligibility for unemployment compensation. A three-judge District Court held that the scheme violated due process because it failed to provide an adequate hearing and because administrative review of the hearing examiner's decision took an unreasonably long time. After this Court noted probable jurisdiction, the state legislature amended the relevant statutes, establishing additional procedural protections at the hearing stage and altering the structure of administrative review to make it quicker and fairer. Because these changes "[might] alter significantly the character of the system considered by the District Court," *id.*, at 386–387, and because it was unclear how the new procedures would operate, *id.*, at 388–389, we vacated the lower court's judgment and remanded for reconsideration in light of the intervening changes in state law. See *id.*, at 390; see also *Allee* v. *Medrano*, 416 U. S. 802, 818–820 (1974) (where criminal statutes declared unconstitutional were replaced by "more narrowly drawn" versions, case was moot absent pending prosecutions).

These precedents establish that, where a challenged statute is replaced with more narrowly drawn legislation pending our review, and the plaintiff seeks only prospective relief, we generally should decline to decide the case. The controversy with respect to the old statute is moot, because a declaration of its invalidity or an injunction against the law's future enforcement would not benefit the plaintiff. Where we cannot be sure how the statutory changes will affect the plaintiff's claims, dismissal avoids the possibility that our decision will prove advisory.

## B

Like *Diffenderfer*, this case concerns a law that was repealed and replaced after this Court granted review. Petitioner's complaint requests only declaratory and injunctive relief from a set-aside ordinance that no longer exists. The Court acknowledges that Jacksonville's new ordinance is more narrowly drawn than the last. See *ante*, at 662 ("The new ordinance may disadvantage [petitioner's members] to a lesser degree than the old one"). But the majority believes that *Diffenderfer* and similar cases are inapposite because, in the majority's view, Jacksonville's new ordinance does not differ substantially from the one challenged in petitioner's complaint. See *ante*, at 662–663, n. 3. I cannot agree.

"The gravamen of petitioner's complaint," *ante*, at 662, as I read it, was that the original set-aside law violated the Equal Protection Clause for two reasons: The law "[lacked] an adequate factual basis," in that the city had not undertaken studies to determine whether past discrimination or its continuing effects made a preference program necessary, App. 15–17; and the ordinance "[was] not narrowly tailored to remedy any prior racial discrimination," because the program was not limited in time, the 10% set-aside figure was not rationally related to any relevant statistic, and preferences were awarded to groups against whom no discrimination ever had occurred in the city, *id.*, at 17–18. The District Court invalidated the ordinance on the authority of *Rich-*

*mond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989), in which we held that a set-aside program deficient in similar respects violated the Equal Protection Clause. App. to Pet. for Cert. 10–13. The District Court concluded that Jacksonville had not made sufficient findings of past discrimination; it therefore did not reach the "narro[w] tailor[ing]" question. *Id.,* at 12.

The new ordinance clearly was written to remedy the constitutional defects that petitioner alleged and the District Court found in the original program. The new law was passed after completion of an independent study, which the city commissioned, and after a select committee of the Jacksonville City Council conducted numerous public hearings. The new ordinance expressly adopts the select committee's findings concerning "the present effects of past discrimination" in city contracting. Jacksonville Purchasing Code § 126.601 (1992).

The city's effort to make the law more narrowly tailored also is evident. By its terms, the new program will expire in 10 years. § 126.604(a). In addition, as the Court explains, all but two of eight previously favored groups have been eliminated from the list of qualified participants; the participation goals vary according to the type of contract and the ownership of the contractor; and there are now five alternative methods for achieving the participation goals. See *ante*, at 660–661. Only one of the five methods for complying with the participation goals, the "Sheltered Market Plan," resembles the earlier set-aside law. *Ante*, at 661. It is unclear how the city will decide when, if ever, to use the Sheltered Market Plan, rather than an alternative method, for a particular project. As in *Fusari*, "we can only speculate how the new system might operate." 419 U. S., at 388–389.

Whether or not the new ordinance survives scrutiny under the Fourteenth Amendment—a question on which I express no view—I cannot say that these changes are "insignificant," *ante*, at 662, to petitioner's equal protection claim. The ma-

jority avoids this difficulty by characterizing petitioner's complaint in the most general terms possible: "The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts." *Ibid.* We did not undertake such a generalized approach in *Diffenderfer* or our other cases involving more narrowly drawn statutory changes. There, as here, any challenge to the new law "presents a different case," *Allee,* 416 U. S., at 818, and the proper course therefore is to decline to render a decision.

That the only issue before us—and the only question decided by the Court of Appeals—concerns petitioner's standing does not compel a different result. Cf. *Burke* v. *Barnes,* 479 U. S., at 363 (declining to reach standing question where expiration of law mooted controversy). A determination that petitioner has standing to challenge the repealed law avails it nothing, since that law no longer exists. Petitioner can benefit only from a determination that it has standing to challenge the new ordinance. But even assuming that the standing questions are identical under the old and new ordinances, the Court's decision in this case, in my view, remains inappropriate. Petitioner has not yet attempted to amend its pleadings or to file another complaint to challenge the new ordinance. See Tr. of Oral Arg. 5. Thus, today's ruling on the standing question could prove advisory. For that reason, I believe the wiser course, and the one most consistent with our precedents, would be to follow *Diffenderfer.* On the authority of that case, I would vacate the Court of Appeals' judgment and remand to that court with instructions to remand the case to the District Court to permit the petitioner to challenge the new ordinance.

## II

I also cannot agree with the majority's assertion that *City of Mesquite* "control[s]" this case. *Ante,* at 661. I understand *City of Mesquite* to have created a narrow exception to

the general principles I have described—an exception that clearly is inapplicable here.

The plaintiff in *City of Mesquite* challenged a licensing ordinance governing coin-operated amusement establishments. One of the factors considered in determining whether to grant a license under the ordinance was whether the applicant has "connections with criminal elements." 455 U. S., at 287 (internal quotation marks omitted). The District Court held that this phrase was unconstitutionally vague, and the Court of Appeals affirmed. While the case was pending before the Court of Appeals, however, the contested language was eliminated from the ordinance.

When the case came before us, we concluded that it need not be dismissed as moot. We relied on the voluntary-cessation doctrine, which provides that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.*, at 289. If it did, defendants forever could avoid judicial review simply by ceasing the challenged practice, only to resume it after the case was dismissed. In such cases, we have said that the defendant, to establish mootness, bears a heavy burden of "demonstrat[ing] that there is no reasonable expectation that the wrong will be repeated." *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953) (internal quotation marks omitted).

In *City of Mesquite,* we decided to reach the merits of the plaintiff's claim because "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." 455 U. S., at 289. We expressly noted that the city in fact had announced an intention to do exactly that, just as it already had eliminated and then reinstated another aspect of the same ordinance in the course of the same litigation, obviously in response to prior judicial action. *Id.*, at 289, and n. 11. These circumstances made it virtually im-

possible to say that there was "no reasonable expectation" that the city would reenact the challenged language.

*City of Mesquite* did not purport to overrule the long line of cases in which we have found repeal of a challenged statute to moot the case. Significantly, we have not referred to the voluntary-cessation doctrine in any other case involving a statute repealed or materially altered pending review. The reason seems to me obvious. Unlike in *City of Mesquite*, in the ordinary case it is not at all reasonable to suppose that the legislature has repealed or amended a challenged law simply to avoid litigation and that it will reinstate the original legislation if given the opportunity. This is especially true where, as here, the law has been replaced—no doubt at considerable effort and expense—with a more narrowly drawn version designed to cure alleged legal infirmities. We ordinarily do not presume that legislative bodies act in bad faith. That is why, other than in *City of Mesquite*, we have not required the government to establish that it cannot be expected to reenact repealed legislation before we will dismiss the case as moot.

At most, I believe *City of Mesquite* stands for the proposition that the Court has discretion to decide a case in which the statute under review has been repealed or amended. The Court appropriately may render judgment where circumstances demonstrate that the legislature likely will reinstate the old law—which would make a declaratory judgment or an order enjoining the law's enforcement worthwhile. But such circumstances undoubtedly are rare. And the majority points to nothing in the record of this case to suggest that we are dealing with the same sort of legislative improprieties that concerned us in *City of Mesquite*.

The majority is therefore quite unconvincing in its assertion that the mootness question in this case "is controlled by" *City of Mesquite*. *Ante*, at 661. By treating that exceptional case as announcing a general rule favoring the exer-

cise of jurisdiction, moreover, today's decision casts doubt on our other statutory-change cases and injects new uncertainty into our mootness jurisprudence. In my view, the principles developed in the other decisions I have described should continue to apply in the ordinary case. Where, as here, a challenged statute is replaced with a more narrowly drawn version pending review, and there is no indication that the legislature intends to reenact the prior version, I would follow *Diffenderfer*, vacate the lower court judgment, and direct that the plaintiff be permitted to challenge the new legislation. Accordingly, I respectfully dissent.