**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHEMICAL PRODUCERS AND
DISTRIBUTORS ASSOCIATION,
                 *Plaintiff-Appellant,*

        v.

PAUL E. HELLIKER, Director of the
California Department of Pesticide
Regulation,
                 *Defendant-Appellee,*

        and

SYNGENTA CROP PROTECTION, INC.;
DOW AGROSCIENCES LLC; BASF
CORPORATION; BAYER CROPSCIENCE
LP; DU PONT DE NEMOURS AND
COMPANY; MONSANTO COMPANY,
                 *Defendants-Intervenors-*
                 *Appellees.*

No. 04-56318

D.C. No.
CV-02-09781-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
May 4, 2006—Pasadena, California

Filed August 31, 2006

Before: Michael Daly Hawkins and Richard A. Paez,
Circuit Judges, and Neil V. Wake,* District Judge.

*The Honorable Neil V. Wake, United States District Judge for the District of Arizona, sitting by designation.

10615

Opinion by Judge Wake

**COUNSEL**

David H. Bamberger, DLA Piper Rudnick Gray Cary US LLP, Washington, D.C., for the plaintiff-appellant.

Stanley W. Landfair and Lawrence S. Ebner, McKenna Long & Aldridge LLP, Los Angeles, California, for the defendants-intervenors-appellees.

**OPINION**

WAKE, District Judge:

We must decide whether intervening amendments to California's pesticide registration laws, which were challenged and upheld below, render this appeal moot. We hold they do. Because the amendments cannot be attributed to the voluntary conduct of the party seeking relief from the judgment, we vacate the district court's judgment.

## I.   Federal and California Pesticide Regulation

Under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 to 136y ("FIFRA"), all pesticides must be registered with the Environmental Protection Agency before being sold or distributed. 7 U.S.C. § 136a(a). Pesticides also must be registered with California's Department of Pesticide Regulation ("the Department") to be sold in California. Cal. Food & Agric. Code § 12811 (Deering 2006). Both the California and federal registration laws require prospective sellers to submit with their registration applications extensive data on the health and environmental effects of their pesticides. Because the testing required to produce such data is costly, applicants seeking to register pesticides with the same active ingredients as previously registered pesticides have incentive to acquire and use data submitted by prior registrants.

FIFRA's rules relating to re-use of data by secondary registration applicants fall into time periods beginning on the date the data were originally submitted. Original registrants are entitled to exclusive control over the data submitted with their application for ten years following their registration. 7 U.S.C. § 136a(c)(1)(F)(i). During the ten-year period, secondary registrants may use such data only if they obtain written consent from the original registrant, i.e., a "letter of authorization." The exclusive control afforded to original registrants during

this period allows them to deny use of their data to others or to set their own prices for letters of authorization. After this ten-year period is a five-year "mandatory data-licensing" period. During the five years, secondary applicants may rely on previously filed data without permission from the original submitter but "only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator [of the Environmental Protection Agency] accompanied by evidence of delivery to the original data submitter of the offer." *Id.* at 136a(c)(1)(F)(iii). If the original data submitter deems the offer unsatisfactory, the amount of compensation is fixed through binding arbitration. *Id.* Arbitrated pricing during this mandatory-licensing period replaces the original submitter's previous power unilaterally to dictate the price secondary applicants must pay to use the data. Disagreement between the original submitter and a new applicant, moreover, will not delay the new applicant's registration. *Id.* After expiration of the five-year mandatory data-licensing period, the data become freely available for use by secondary applicants. *Id.* at 136a(c)(1)(F)(iv).

When this case began, California required secondary applicants to obtain letters of authorization from original data submitters when federal law did not. While federal law provides only a ten-year period of exclusive use to original submitters, California law granted them exclusive use in perpetuity. Cal. Food & Agric. Code § 12811.5 (Deering 2004). Before its amendment, section 12811.5 read:

> Except as provided in Section 13128, *data*, other than public literature, *previously submitted to the director or the Administrator of the United States Environmental Protection Agency* to support an application for the original registration of a pesticide, or to support an application for an amendment adding any new use to that registration and that pertains solely to that use, *shall not, without the written permission of the original data submitter*, or its

> assigns or successors in interest, *be considered by the director to support an application by another person.*

*Id.* (emphasis added); *see also* Cal. Code Regs. tit. 3, § 6170(c) (Barclay 2004). Thus, in California a secondary applicant could never use previously submitted data without permission from the original submitter, who could hold out for any price or refuse authorization altogether.

Chemical Producers and Distributors Association ("the Association"), a trade organization of manufacturers and sellers of generic pesticides, brought this action against Paul Helliker, Director of the Department, challenging California's longer exclusive use period. The complaint sought an injunction and a declaration that the California statute was preempted "to the extent that [it] purport[s] to grant data submitters in California exclusive use rights to data that were previously submitted to EPA and are subject to FIFRA's mandatory data-licensing scheme."

The Director declined to defend the law he was charged with enforcing. However, Syngenta Crop Protection, Inc., Dow Agrosciences L.L.C., B.A.S.F. Corporation, Bayer Cropscience L.P., E.I. Du Pont De Nemours and Company, and Monsanto Company ("Intervenors") intervened as defendants in support of the California statute and regulations. The district court granted summary judgment for the Intervenors and the Director, finding the state statute and regulations not preempted. *Chem. Producers & Distrib. Ass'n v. Helliker*, 319 F. Supp. 2d 1116 (C.D. Cal. 2004). The Association appealed.

While the appeal was pending, California enacted amendments to its pesticide registration law, effective January 1, 2006. The amended statute eliminates any state law period of exclusive use by the original data submitter. Instead, California now allows mandatory data-licensing at arbitrated prices

from the outset for secondary users, although a new applicant may obtain a letter of authorization if the original data submitter is willing. Alternatively, a new applicant may (1) formulate or obtain its product from a source that has data authorization from the data owner or (2) formulate or obtain its product from a source that has irrevocably offered to pay the data owner a share of the cost of producing the data. Cal. Food & Agric. Code §§ 12811.5(a) & (c) (Deering 2006). Like FIFRA, the new law provides for arbitration where an irrevocable offer to pay is made but price is not agreed upon, and a secondary applicant's registration will not be delayed by the dispute. *Id.* at § 12811.5(d). As in FIFRA, data may be used by secondary registrants without compensation to the original submitter after a certain period. *Id.* at § 12811.5(a). In FIFRA that period is fifteen years, and under the amended California law it is fifteen years for data submitted after August 1, 2005, and seventeen years for data submitted before that date. *Id.* at § 12811.5(a)(3).

In summary, although the new California law does not replicate FIFRA's first ten-year period of original submitters' exclusive entitlement to their data, original submitters still have that exclusivity, even in California, by force of FIFRA's terms. The former California law's extension of the exclusive use period beyond FIFRA's ten years is abolished. In no circumstance does the California law now give original submitters exclusive right to their data for California registration purposes when FIFRA subjects those data to mandatory licensing at arbitrated prices.

In light of the amendments, the Association suggests its appeal is moot and moves for vacatur of the lower court's judgment. Intervenors contest both mootness and vacatur.

## II.  Mootness

[1] "Where intervening legislation has settled a controversy involving only injunctive or declaratory relief, the controversy

has become moot." *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987) (citations omitted). Here the Association sought only injunctive and declaratory relief. We therefore must decide whether California's amended statute has settled the Association's controversy.

## A. Statutory Amendment as Settling the Controversy

[2] The test for whether intervening legislation has settled a controversy involving only declaratory or injunctive relief is "whether the new [law] is sufficiently similar to the repealed [law] that it is permissible to say that the [government's] challenged conduct continues." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993) (citations omitted). Where the law has been "sufficiently altered so as to present a substantially different controversy from the one the District Court originally decided," there is "no basis for concluding that the challenged conduct [is] being repeated." *Id.* (citations and internal quotation marks omitted).

[3] In evaluating whether the government's challenged conduct continues, the case or controversy giving rise to jurisdiction is the touchstone. *See id.* at 662; *Diffenderfer v. Cent. Baptist Church of Miami, Inc.*, 404 U.S. 412, 414 (1972); *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 815 (9th Cir. 1995). In *Northeastern Florida*, for example, a trade association representing mostly non-minority construction firms sought an injunction and declaration that the city's set-aside program for minority businesses was unconstitutional. 508 U.S. at 658-59. Intervening amendments to the program did not render the case moot:

> The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and

> female-owned contractors — and, in particular, inso-
> far as its "Sheltered Market Plan" is a "set aside" by
> another name — it disadvantages them in the same
> fundamental way.

*Id.* at 662 (footnote omitted).

The same inquiry yielded the opposite answer in *Diffenderfer*. 404 U.S. at 415. There the plaintiffs sought a declaratory judgment striking down Florida's tax exemption for church property used primarily for commercial purposes. *Id.* at 412-13. Although the trial court upheld the law, Florida amended it while the case was on appeal. The new version exempted church property from taxation "only if the property is used predominantly for religious purposes and only to the extent of the ratio that such predominant use bears to the non-exempt use." *Id.* at 413-14 (citations and internal quotation marks omitted). The "crux" of plaintiff's complaint was the unconstitutionality of "state aid in the form of a tax exemption for church property used primarily for commercial purposes." *Id.* at 413. The case was mooted because the church parking lot that was the "subject of the . . . complaint" was no longer exempt beyond the extent of its church use. *Id.* at 414-15.

**[4]** Here the case or controversy the Association posed was that its member-companies were "directly and adversely affected by the letter of authorization requirement" in their attempts to register generic pesticides in California. The Association's grievance over the letter of authorization requirement in the former section 12811.5, which effectuated exclusive use rights for original submitters in perpetuity, was the "crux," the "gravamen," and indeed the only grievance, of the complaint. The new statute has resolved that grievance. The member-companies of the Association are no longer affected by the letter of authorization requirement in the way contested by the Association. Although a letter of authorization remains one avenue for generic pesticide companies to secure the use of previously filed data, it is only an alternative

to other avenues, including mandatory licensing at arbitrated prices. The new statute accords letters of authorization a role no larger than they play in FIFRA, which is everything the Association hoped to achieve by this action.[1]

**[5]** Intervenors' search for life in this case looks to a savings clause in the new section 12811.5 concerning future adjudications of the lawfulness of existing registrations. That provision, subdivision 12811.5(j), states: "No cost sharing as provided in subdivisions (a), (b), and (c) shall be required to support an application for annual renewal of pesticide product registration, provided this provision shall not authorize renewal of a product registered prior to the effective date of this section if that registration is declared to have been unlawfully issued by a court of competent jurisdiction." The "cost sharing" of subdivisions (a), (b), and (c) refers to the mandatory data licensing and compensation. Some registrations previously granted have been challenged in the state courts. *See, e.g.*, *Syngenta Crop Prot., Inc. v. Helliker*, 138 Cal. App. 4th 1135, 42 Cal. Rptr. 3d 191 (2006).

**[6]** Subdivision (j) plainly seeks to avoid inadvertently redeeming registrations that were invalid when granted and are so adjudicated in the future. Subdivision (j) states explicitly what the amendment as a whole would mean even without subdivision (j): that the validity of prior registrations turns on the law at the time and is not affected by the January 1, 2006 amendment.

---

[1]The mandatory licensing terms of the new California statute differ from those of FIFRA in one limited respect. For some data, the new California law entitles original submitters to compensation at arbitrated prices for two years longer than FIFRA. *See* Cal. Food & Agric. Code § 12811.5(a)(3) (Deering 2006). Intervenors rightly do not contend that this difference affects mootness, for it is not relevant to the Association's sole challenge to the former California law's grant of exclusive rights longer than those provided in FIFRA.

Intervenors argue that litigation of old registrations as contemplated by subdivision (j) may occasion a decision on the preemptive effect of FIFRA on the old statute. However, Intervenors point to no litigation or actual controversy posing that issue and do not sufficiently explain how FIFRA preemption of the former California statute would arise in litigation over registrations that should not have been issued.

[7] In any event, any disputes regarding the unlawfulness of registrations already issued are beyond the complaint in this case. The Association's sole challenge here is that FIFRA preempts California's former grant of exclusive use rights to original submitters beyond the period such rights are provided by FIFRA. This case involves no registration actually obtained. Intervenors' bare assertion that such litigation could reach the issue decided below in this case is speculative and falls far short of sustaining a case or controversy here. *See Hall v. Beals*, 396 U.S. 45, 49-50 (1969) (holding that "speculative contingencies afford no basis for our passing on the substantive issues the appellants would have us decide with respect to the now-amended law of Colorado" (citations omitted)); *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) ("[N]either we, nor the Supreme Court, have ever allowed plaintiffs to challenge a statute unless the plaintiffs had an actual and well founded fear that the law will be enforced against *them*." (citations and internal quotation marks omitted)).

## B. Statutory Amendment as Voluntary Cessation

[8] Intervenors argue, the statutory amendment notwithstanding, that the voluntary cessation exception to mootness applies. Under that doctrine, a "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *accord Ne. Florida*, 508 U.S. at 661-62. If it were otherwise, "the defendant's mere voluntary cessation would compel the

courts to leave the defendant free to return to his old ways." *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1194 (9th Cir. 2000) (citations, alterations and internal quotation marks omitted); *accord City of Mesquite*, 455 U.S. at 289 n.10.

Intervenors draw comfort from general language in some of our cases. "Our circuit, perhaps following the lead of the Supreme Court, has issued somewhat confused pronouncements regarding mootness generally, and mootness in the context of repealed or amended statutes in particular." *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003). As we noted in *Jacobus*, sometimes we have said that "if a challenged law is repealed or expires, the case becomes moot," *id.* (citing *Smith*, 233 F.3d at 1195, *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994), and *Barilla v. Ervin*, 886 F.2d 1514, 1521 (9th Cir. 1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996)), and at other times we have said that repeal or amendment "does not deprive a federal court of its power to determine the legality of the practice." 338 F.3d at 1103 (citing *Carreras v. City of Anaheim*, 768 F.2d 1039, 1047 (9th Cir. 1985), and *City of Mesquite*, 455 U.S. at 289) (internal quotation marks omitted).

The confusion in our pronouncements diminishes if our cases are examined on their facts. The cases we cited in *Jacobus* for a near categorical rule of mootness are cases of statutory amendment. The examples we cited of continuing federal adjudicatory power are of local government or administrative agency repeal or amendment. Some of our pronouncements were in cases that were not moot. *E.g.*, *Jacobus*, 338 F.3d at 1104; *Carreras*, 768 F.2d at 1047; *see also City of Mesquite*, 455 U.S. at 289 & n. 11 (amending authority announced its intention to reenact); *Coral Constr. Co. v. King County*, 941 F.2d 910, 927 (9th Cir. 1991) (remanded to determine whether amended ordinance mooted the case).

**[9]** The voluntary cessation doctrine comes into play in diverse circumstances, so sometimes our pronouncements

have been general. Nevertheless, we have been clear in refining the voluntary cessation exception for state legislative enactments that otherwise moot a controversy. In that circumstance the exception is narrow:

> A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed. As a general rule, if a challenged law is repealed or expires, the case becomes moot. *The exceptions to this general line of holdings are rare and typically involve situations where it is virtually certain that the repealed law will be reenacted.*

*Native Vill. of Noatak*, 38 F.3d at 1510 (emphasis added; citations omitted); *accord Smith*, 233 F.3d at 1195; *see also Barilla*, 886 F.2d at 1521 (rejecting appellant's voluntary cessation argument where there was no indication that the state legislature intended to repeal the statutory amendments).

**[10]** This is not one of those rare cases in which it is "virtually certain that the repealed law will be reenacted." *Village of Noatak*, 38 F.3d at 1510. Indeed, there is no reason to think the California legislature enacted the amendment with a mind to restoring the old law later. Nor is there any reason to think the Association would seek its own harm by asking the legislature to do so.

**[11]** Because the statutory amendment has settled this controversy, this case is moot.

## III.  Vacatur

**[12]** In deciding whether to vacate a moot judgment, "the principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action." *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994) (citations omit-

ted). In this circuit, causation of mootness is a threshold question. Where mootness was caused by "voluntary action" of the party seeking vacatur, "we generally remand with instructions to the district court to weigh the equities and determine whether it should vacate its own judgment." *Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997); *accord Cammermeyer v. Perry*, 97 F.3d 1235, 1239 (9th Cir. 1996); *Dilley v. Gunn*, 64 F.3d 1365, 1370-71 (9th Cir. 1995). Where mootness was caused not by the "voluntary action" of the party seeking vacatur but by "happenstance" or the "vagaries of circumstance," we direct vacatur. *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 799 (9th Cir. 1999) (en banc); *see also Pub. Utils. Comm'n v. FERC*, 100 F.3d 1451, 1460-61 (9th Cir. 1996); *Mayfield*, 109 F.3d at 1427. When we cannot by resort to the factual record determine whether mootness was caused by the voluntary action of the party seeking vacatur, this threshold question too is left to the district court. *See Dilley*, 64 F.3d at 1371.

Intervenors argue that the Association's advocacy before the California Legislature voluntarily mooted this case, thus precluding vacatur by this court. The Association sent letters to every member of the Senate Committee on Environmental Quality and the Assembly Committee on Agriculture urging passage of the bill that would eliminate the letter of authorization requirement. An Association delegation also discussed the issue with the Assembly.

**[13]** Lobbying Congress or a state legislature cannot be viewed as "causing" subsequent legislation for purposes of the vacatur inquiry. Attributing the actions of a legislature to third parties rather than to the legislature itself is of dubious legitimacy, and the cases uniformly decline to do so. Even where new legislation moots the executive branch's appeal of an adverse judgment, the new legislation is not attributed to the executive branch. *See Khodara Envtl., Inc. ex rel Eagle Envtl., L.P. v. Beckman*, 237 F.3d 186, 194-95 (3d Cir. 2001) (stating that the *U.S. Bancorp* presumption against vacatur

applies "when mootness results from the voluntary action of the party seeking relief from the judgment below," but declining to apply the presumption where a federal agency's appeal was mooted by congressional action); *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 121 (4th Cir. 2000) ("In this case, the mootness was, as noted, caused by the state legislature's amendment of statutory provisions that it had earlier enacted, and not by the actions of the defendants before this court, all of whom are state executive officials, none of whom is the Governor. Therefore, defendant state executive officials are in a position akin to a party who finds its case mooted by 'happenstance,' rather than events within its control." (citations, alterations and internal quotation marks omitted)); *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 351-52 (D.C. Cir. 1997) (vacating judgment when the District of Columbia's appeal was mooted by the District of Columbia's legislative action); *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1187 (D.C. Cir. 1992) (finding the duty to vacate was "certain" where executive branch officials lost below and Congress amended the statute); *see also U.S. Bancorp*, 513 U.S. at 25 n.3 (noting the "implicit conclusion" in *United States v. Munsingwear*, 340 U.S. 36 (1950), that the "repeal of administrative regulations cannot fairly be attributed to the Executive Branch when it litigates in the name of the United States"); *U.S. Dep't of the Treasury v. Galioto*, 477 U.S. 556, 559-60 (1986) (vacating for mootness the lower court's judgment that the federal firearms statutes were unconstitutional because "Congress came to the conclusion, as a matter of legislative policy, that the firearms statutes should be redrafted").

The principle that legislation is attributed to the legislature alone is inherent in our separation of powers. *See Khodara*, 237 F.3d at 195 ("Mindful of the fact that legislative actions are presumptively legitimate, we are wary of impugning the motivations that underlie a legislature's actions." (citations and internal quotation marks omitted)); *Nat'l Black Police Ass'n*, 108 F.3d at 352 ("The legislature may act out of reasons totally independent of the pending lawsuit, or because

the lawsuit has convinced it that the existing law is flawed."); *id.* at 353 ("Separation of powers concerns provide further reason to exempt . . . the situation of a case which has become moot on appeal due to passage of legislation."); *Am. Library Ass'n*, 956 F.2d at 1187 ("Congress rendered the case moot by passing legislation designed to repair what may have been a constitutionally defective statute. Congress' action represents responsible lawmaking, not manipulation of the judicial process.").

The rule of vacatur that we recognize is for mootness caused by enactments of Congress and state legislatures. The strength of the rule may attenuate for lesser public bodies and those with mixed legislative and executive character, where closer inquiry may be permissible. We do not have occasion in this case to calibrate that attenuation.

**[14]** The statutory amendment that moots this case legally cannot be attributed to the Association, regardless of its legislative advocacy. We accordingly vacate the lower court's judgment and remand with instructions to dismiss the case as moot.

VACATED and REMANDED.