**HOUSTON CONTRACTORS ASSOCIATION,
Plaintiff,**

v.

**METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, Defendant.**

**Civil Action No. H–93–3651.**

United States District Court, S.D. Texas.

April 23, 1996.

Order Clarifying Injunction May 8, 1996.

Thomas C. Fitzhugh, III, Fitzhugh & Thompson, Houston, TX, David B. Dickinson, Ewalt & Dickinson, and Stuart M. Nelkin, Nelkin & Nelkin, Houston, TX, for Plaintiffs.

Rex D. VanMiddlesworth, Mayor Day Caldwell and Keeton, and Gene L. Locke, City of Houston Legal Dept, Houston, TX, for Defendants.

OPINION ON PRELIMINARY INJUNCTION

HUGHES, District Judge.

1. *Introduction.*

An association of local construction contractors has sued Houston's Metropolitan Transit Authority for using race and sex as criteria in its contracting process. The contractors complain that Metro's use of these factors in its bidding and contract administration is an instance of a government's treating similar people differently in violation of the constitutional restrictions on governmental power. Metro responds that it does not have a racial preference: it says it has a program merely to encourage bids for contracts and subcontracts by a wide variety of contractors and subcontractors.

The parties worked to settle this dispute between the filing of the suit in 1993 and now. When the negotiations reached an impasse, the parties asked the court to proceed formally. The court is now obliged to address the contractors' application for an order that keeps Metro from using its policy between now and when the case is finally decided. As the case progresses, the parties' understanding of the facts may change so that the tentative, preliminary findings and conclusions will be shown to have been in error. When that happens, of course, either side may seek a modification of the order. Like the preliminary injunction they support, these early determinations are precisely preliminary.

Because it uses race and sex as criteria in the bid process and as a contract term, Metro's disadvantaged business enterprise program will be suspended until the final decision in this case.

2. *Houston Contractors & Metro.*

Houston Contractors Association is a private voluntary group of construction-related businesses. Some of its members bid frequently on jobs with the Metropolitan Transit Authority of Harris County.

Metro is a dependent governmental district, authorized by the Texas legislature, furnishing transportation to parts of Harris County and the Houston metropolitan area. Metro was created in 1978. Its policy is set by a board appointed through its constituent city governments. Metro has a capital budget this year of $500 million, much of which is equipment. The construction budget for roads, bridges, terminals, and similar projects is about $200 million, representing about 25% of that kind of construction in the Houston region.

Metro derives its funds from four sources: fares, its local sales tax, Texas transportation grants, and federal transportation grants. Although state and federal grants tend to be project-specific, they are partial support for the project; therefore, it is impossible to identify separate activities by the source of funds. The state and federal grants carry

requirements about social responsiveness. This case arises from the way Metro has conducted its contracting process in connection with race and sex.

### 3. *The Policy.*

In 1990 Metro adopted its Disadvantaged Business Enterprise Program. The program requires bidders on Metro's prime contracts to make a good faith effort to use qualifying DBE subcontractors and suppliers for at least 21% of the gross contract price. When a bid is submitted, the contractor must identify the DBEs, their work, and their price.

According to Metro, a disadvantaged business enterprise is a small business, managed and owned over 50% by socially and economically disadvantaged individuals. To qualify as a disadvantaged person through whom an enterprise may qualify, the owners and controllers must have suffered social disadvantage beyond mere membership in a socially disadvantaged class. Metro says it considers whether the person has suffered social disadvantage in education, employment, and business history. Metro does not examine the actual social and economic status of a person in these categories: Black, Hispanic, Native American, Asian Pacific, Asian Indian, or female. Metro presumes that every member of these groups is socially and economically disadvantaged.

These groups are historically victims of racial, sexual, and ethnic discrimination; none has been legally or customarily discriminated against by Metro, except in the odd individual instance of a personal failure among its other employees. The program has one level of required participation by these groups in the aggregate: 21%; therefore, under Metro's program, the social histories of these groups are fungible.

When a contractor has submitted the low bid, the bid is reviewed for technical and fiscal compliance. For instance, a bid that appears unreasonably low is scrutinized for errors that might cause problems for Metro later. Beyond engineering and financial double checking, no bid is sent to the board for approval until the Affirmative Action Office has approved it.

The review by the affirmative action office is based on the contractor's certification, including Metro form letters, of its intent to use specific DBEs. Correspondence from Metro about the program is through the actual contract administration officer. It is expressed in mandatory terms, like:

> Evaluation of ... your bid involves ... an evaluation of your response to the Disadvantaged Business Enterprise provisions. As evidence of commitment in this regard, Metro requests that you enter into a Letter of Intent for each subcontractor and supplier.... Sample Letters of Intent are attached.
>
> The ... percentages ... are expected to match those ... submitted with your bid. Failure to provide the required Letter(s) of Intent ... will be cause for rejection of your bid.

Letter from Günther Schieb, Sr. Contracts Administrator, Metropolitan Transit Authority, to Karen S. Steinem, Beyer Construction, Inc. (March 21, 1996) (exhibit 3 to April 18, 1996, Hearing on Houston Contractors Association's Motion for Preliminary Injunction).

Part of the program requires that for some contracts Metro will consider only bids made by DBEs, which effectively segregates part of Metro's third-party work to those officially-favored contractors, meaning that the disfavored ones will never have an opportunity to receive some of the contracts. Disadvantaged Business Enterprise Program, Metropolitan Transit Authority of Harris County, § X "Set–Aside" Program (1990).

### 4. *Standing.*

■ Metro has questioned whether the association has members who have been directly harmed by the program. This must be tentatively decided early in the litigation as a means of assuring that law suits are brought by those who have a direct interest in a real dispute. Access to courts is limited to those who have standing, as it is called.

To be a party to what the Constitution calls a "case or controversy," the association must show that (a) one of its members suffered harm directly from Metro's program, and (b) a decision in its favor would alleviate the harm. Simply put, the Constitution does

not permit suits if brought by bystanders nor if the result will be an empty gesture.

Houston Contractors Association may bring this action about the constitutionality of the program; it stands in a direct relation to the program and its injurious consequences because:

- Some of the contractors, who are the constituents of the association, have apparently been hurt by their having been required by Metro's program to use higher-cost subcontractors than they would have without it;

- Favored contractors do not have to incur the higher compliance costs of the program;

- The program apparently has caused some of the members to lose subcontracting opportunities, and

- The way that Metro administers its program makes the contractors vulnerable to a standardless "responsiveness" review.

## 5. *The Law.*

As John Marshall wrote, "Let the end be legitimate, [then] all means that are appropriate ... to that end, which are not prohibited [by] the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). The Constitution says:

> No [government] shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any [government] deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

■ That means: when a governmental action affecting a component individual liberty uses a classification to achieve a legitimate state interest, the judiciary will examine the congruence of the means of classification with the purpose of the act under the actual facts to guarantee that individuals who are similarly situated are similarly treated. As the significance of the particular right increases, the vigor of the court's examination increases.

A governmental program favoring one person over another is arbitrary whenever the favoritism is based on a criterion unrelated to the legitimate goal of the program. The system we constituted subordinates will to reason. By definition, arbitrariness is not rational. The rule of law in America requires more than the forms of enactment by an authority; partial measures, as they were called in 1789, offend the constitutional requirements of generality and neutrality found in phrases like "due process of law," "equal protection of the law," and in Texas "due course of law" and "equal rights." The Texas Constitution has an express prohibition of local and special laws. TEX. CONST. art. 3, § 56.

Parenthetically, the officers of Metro are required by the United States Constitution to take an oath to support it. Their duty is first to the Constitution, not to Metro—much less to a particular program. U.S. CONST. art. VI, ¶ 3.

## 6. *Legitimate Ends.*

■ The legitimate end of the Metropolitan Transit Authority is to furnish transportation to the Houston metropolitan area. Its direct programs include a bus system, park-and-ride terminals, high-occupancy-vehicle lanes within freeways, and construction assistance to its constituent municipalities for bridges and roads.

In performing its institutional function as a transportation agency, Metro has adopted a social program with a purpose collateral to facilities and operations for public transportation. This official solicitude for disadvantaged business enterprises is secondary to its transportation mission.

Metro says that its concern for increased participation is a legitimate function within its governmental authority. It claims that it is (a) correcting the results of historic discrimination by others, (b) lowering its costs by increasing the pool of subcontractors who bid to its prime contractors, and (c) carrying out its obligations to its authorizing and funding superiors.

### A. *Historical Wrongs.*

While the state of Texas possesses the residual authority to adopt programs that address social ills, the state has never confided that authority to Metro, except in the narrow instance of a purchasing goal. *See* TEX.TRANS.CODE ANN. § 451.251 (1996). Although it might be legitimate for Texas to adopt a program aimed at curing the persistent effects of its own historical discrimination, that is not part of the power allocated to Metro.

Since Metro did not participate in the traditional discrimination of Texas's laws, it is not correcting its own wrongs. Metro's concern for social justice may be sincere, but that is not an area of authority confided to it by Texas. Even the Texas statute that requires an evaluation of "minority" participation does not carefully limit itself to the actual classes against which Texas traditionally acted.

### B. *Lower Costs.*

Metro correctly says that, if all artificial and irrational barriers to full participation in the economy were eliminated, the number of people bidding on subcontracts would increase, and that increase would produce lower costs through competition itself and through attracting the best qualified people in the whole community for a particular job. The end of furnishing services to the public through low cost and high quality subcontractors is legitimate as long as the technique used is confided to Metro and is not otherwise prohibited.

### C. *Obeying Orders.*

Metro says that it is only doing what its funding sources require, especially the federal Department of Transportation. Having a contract or political relation that obliges Metro to violate the Constitution is no excuse. If it needs to violate the Constitution to get funds from a third party, Metro must find another source or do without. Metro is responsible for Metro, whether its wrong ideas came from federal bureaucrats or from watching too much television.

Neither the federal nor state statute clearly requires the program as Metro apparently administers it. Under Texas law, Metro is required to award contracts based on competitive bidding. TEX.TRANS.CODE ANN. § 451.110 (1996). If Metro is right about what the federal regulations require, it still has an independent obligation to comply with our basic law. Houston Contractors complains about what Metro does in actual practice to the members who bid on Metro jobs; that is a self-contained dispute, although its complications may affect other relations of both Houston Contractors and Metro.

### 7. *The Distinction.*

The sole connection between the DBE requirement and transportation is Metro's judgment that on the whole these groups still suffer from disadvantages in life because of historical injustices. The premise is true, but the conclusion Metro draws is wrong.

Metro relies on the racial and sexual identity of the owners and managers of companies that participate in its contracts. Neither the contractors nor the government has asserted that technical skill or financial responsibility are related to sex or race. One does not ascertain the excellence of a bridge by examining the number of $x$ chromosomes possessed by the engineer nor the capability of an enterprise's management by the birthplace of its stockholders' grandparents.

### 8. *Social Progress & Compensation.*

Because members of these "disadvantaged" groups are more likely than the average person to suffer the disadvantages that resulted from historical and social hostility, Metro concludes that it may discriminate in their favor. It may not.

A government may compensate an individual against whom it has discriminated by making an award from the general resources of the community it serves. If a contractor has offended the laws against discrimination, the law affords a precise process that the victim must follow to obtain the contractor's property in compensation. 42 U.S.C. § 2000a (1989).

If a government has as part of its legitimate authority the redress of social ills, which Metro does not, it may seek remedies for the consequences of past governmental and individual wrongs, but its programs must

address the past ills without inflicting new wrongs by new group disadvantages for someone else. Exclusion from economic opportunity by race is wrong in principle; an inclusion by race implies an equal and opposite exclusion. Progressive purposes do not change the principle.

Assuming that Metro may legitimately exercise social-policy authority beyond transportation, the means it has selected are illegitimate. No government may redress an injury it inflicted by giving its victim the rights of another. Numerous provisions in the Constitution reflect the principle that the individual may not be imposed on for the public good except as his fellow citizens are similarly burdened. The impairment of contracts, takings, bills of attainder, quartering soldiers, and direct taxation clauses are examples.

9. *Congruence.*

Like all distinctions based on race and sex, Metro's classification of disadvantaged business enterprises is a blunt instrument. It is both over- and under-inclusive. The program designates groups and defines control and ownership, fixing the groups who win and lose in its allocation of public resources. The judiciary reviews distinctions by race and sex meticulously because none of them has yet been found to have a rational basis, except in political preference and social convention. The eradication of barriers is a noble goal, but it will not be achieved by creating new barriers.

A. *Class Presumption vs. Individual Reality.*

While it is true that statistically members of these groups are more likely to be unable to participate fully in the economy because they suffer from the effects of past discrimination, Metro presumes that all bidders associated with "disadvantaged" groups are actually disadvantaged. Legislative presumptions are at best a convenience and at worst a cloak.

B. *Narrow, Accurate Means.*

Metro may seek "disadvantaged" business participation but not by dictating the race or sex of subcontractors that may be used by prime contractors. Metro's program does not specifically redress past wrongs, and the statute to which it points as the basis for its program clearly is not directed toward righting past wrongs in Houston's contracting market where, for instance, there has been no historical mistreatment of Alaska natives. TEX.TRANS. CODE ANN. § 451.251–53 (1996). Metro's forms actually separate DBEs from WBEs, "women business enterprise," suggesting that "disadvantaged" means merely those groups other than women who have been selected for this political benefit. Metro takes no account of the number of a contractor's "disadvantaged" employees.

C. *Alternative Means.*

Although necessity is not a canon of constitutional interpretation, courts frequently ascertain the governmental unit's constraint in selecting means to achieve its end. Metro's statutory obligation to have a program to increase DBE participation may be achieved by aiming publicity at new bidders or by offering seminars to new bidders. Metro does these things, but there are no compulsory forms nor percentages calculated to one decimal place in that minor part of its program as there are in the part of the program applied so rigorously to the contractors.

10. *Program or Expression.*

Metro insists that its DBE effort is not really a "program" at all but that it is just an expression of ideals. Although the DBE materials specify participation levels and threaten contract cancellation for noncompliance, Metro contends that minority involvement is neither required nor rewarded. If this is true, the Houston Contractors Association will ultimately lose the case.

The program administrator testified that minority participation was a contract term, fully enforceable by Metro. His department is called *affirmative action*, not *equal opportunity*. Contractors are forced to complete detailed forms showing the precise payments to approved subcontractors and suppliers. These forms have no function within Metro except to "ensure compliance" with the program as the Metro staffers "closely monitor" the contractors. *See* letter from Carole A.

Pinkett, Deputy General Manager, Human Resources, Metropolitan Transit Authority, to Robert Barrow, Conrad Construction Company, Inc. (July 21, 1995) (exhibit 10 to April 19, 1996, Hearing on Houston Contractors Association's Motion for Preliminary Injunction).

The program administrator testified that Metro treats the DBE commitment just like other contract terms, passing from the moral obligation of prime contractors to use good faith to the legal obligation of a construction contract. He also said that Metro has at least one secret motive in requiring an identification of subcontractors; that purpose is to prevent bid shopping among subcontractors by prime contractors. This particular policy has no relation to the DBE program, and it protects prime contractors from one form of competition by other prime contractors.

On the evidence produced to this point it is not reasonably disputable that Metro imposes on the contractors to obtain subcontracts for its officially-favored groups.

11. *What Rights?*

Metro insists that it trespasses on no right of the contractors. When a government erects a barrier to make it more difficult for one group to participate in a governmental program, that group has been denied its federally protected constitutional right to equal protection. The injury in fact is not the ultimate inability to secure the benefit; a denial of equal treatment itself is a real injury. Equality of opportunity at law is guaranteed. Although they have submitted evidence of denied contracts and higher subcontract costs as a result of the DBE imposition, the contractors need not show that they were denied a specific contract, and the administrator admits that the bid process keeps them from having an equal opportunity to compete for contracts with DBE contractors. *Northeastern Florida Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 665, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993).

The burdens of a governmental program deny equal protection to those who have the burdens imposed on them without a rational relation of the burdening requirements to the legitimate function of the government. Con-

tractors who are not DBEs must compete for Metro contracts under several handicaps. While the justification for these burdens may vary, they are actually imposed by race and sex. They are actual and identifiable impediments.

A. *Bureaucratic Quagmire.*

The contractors have a complaint about the procedures at the beginning of the bidding process, the goal, disclosures, and commitments. The middle has its defect. When an "apparent low bidder" has met all of the objective criteria of the technical and financial specifications in the bid solicitation, an affirmative action officer evaluates that contractor's good faith in complying with Metro's sociological aspirations. No contract is considered by the board for formal approval without first being approved by the affirmative action officer.

Because Metro has not demonstrated a link between its "goals" and particular discrimination, administrative convenience appears to be its primary interest in setting participation percentage goals. For its administrative convenience, Metro cannot shift the costs of its goals to the particular subset of contractors, requiring extensive paperwork if nothing else. Metro's interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a program that discriminates on the basis of race or sex. Among the legitimate governmental interests, administrative convenience is the least compelling. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507–09, 109 S.Ct. 706, 729–30, 102 L.Ed.2d 854 (1989).

B. *Lost Contracts.*

The contractors have earned a preliminary injunction based on actual economic injuries caused by Metro's program. At least two non-qualifying subcontractors lost subcontracts to DBEs so that the prime contractor could meet Metro's quota, and at least one contractor lost a Metro contract for failure to meet the DBE quota. The contractors have been awarded some prime contracts but have been denied specific portions of those contracts,

have lost a portion of their profits to DBEs, and have incurred additional costs by being required to hire DBEs to do subcontract work that they wanted to perform themselves, reducing the profit originally bid into the job.

### C. *Regional Protectionism.*

A program requiring contractors to give local businesses preferential treatment in their hiring and subcontracting work is protectionist and unconstitutional. It is as yet unclear how strenuously, if at all, Metro's DBE program encourages the use of area businesses in performing contracts. The contractors have standing to see whether Metro's program impermissibly promotes local businesses in violation of the Constitution's prohibition of state and local governments' limiting interstate commerce.

### D. *Presumptions.*

Metro may classify businesses objectively in attempting to determine whether they qualify for status as DBEs; however, individual circumstances must be considered when evaluating whether a particular business has been harmed in the past, thus deserving special consideration to redress past wrongs. Metro must establish criteria tailored to determine which businesses have been actually disadvantaged and design a program specifically to correct those wrongs. Metro apparently presumes a business is disadvantaged if it meets "minority" criteria that do not necessarily identify disadvantaged businesses. A race-based presumption used to certify eligibility must be examined carefully. *Adarand Constructors, Inc. v. Pena, Secretary of Transportation,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). All race-based exclusions rely on a presumption that the disfavored group is unqualified or, perhaps, less deserving.

### 12. *Injunction.*

■ Until a final determination is made about the constitutionality of its program, the Metropolitan Transit Authority of Harris County may not (a) accept data about the participation of disadvantaged business enterprises in bids or contracts—even if the contractors volunteer the information—until the project has been completed nor (b) require directly or indirectly the approval of an officer evaluating a bid or its contractor on non-technical grounds including race and sex nor (c) base its acceptance of bids or payment on contracts on race or sex related considerations.

### A. *Irreparable Injury.*

Metro claims that the contractors have not suffered actual losses of contracts and that they are not disadvantaged at all by the DBE program. The loss of contracts is an incalculable and irreparable damage, though not the worst harm that the non-DBEs apparently suffer. In administering its program, Metro discriminates in favor of DBEs, depriving non-DBE contractors of constitutional equality of opportunity.

### B. *Likely to Prevail.*

The extensive discussion of the facts and law was intended to illustrate that the program is likely to be determined to be unconstitutional, making Houston Contractors likely to prevail at trial.

### C. *Harm vs. Need.*

If it is occurring as the contractors' association says, the denial of constitutional equality is an egregious harm directly affecting the contractors. Metro insists that its program is purely advisory and voluntary. If so, Metro has no need to continue it during this litigation.

Metro says that it could be harmed by a suspension of the program by judicial intervention because the federal government may deny funding. Metro has been instructed to contact its funding sources to determine whether its funding will in fact be affected by this injunction. The statute that requires some program also carries exceptions for outside interference. Metro will not be punished for obeying a court order, which is a factor beyond its control. If this contingent harm appears more likely in the future than it does now, the preliminary relief may then be adjusted. The Houston Contractors Association will post a bond to cover the marginal increase in Metro's costs in dealing with the federal

government, which is approximated at $50,000.

### D. *Public Interest.*

No one has identified a diffuse public interest, unrepresented by the parties, that may be damaged by injunctive relief. The preliminary order imposes no costs on non-parties.

### E. *Scope & Duration.*

The injunction will suspend the differentiation between contractors and subcontractors by race and sex. It will apply to all those who have notice and those who act in concert with Metro. It obviously applies directly to all Metro officials and employees, but it also applies to Metro's consultants and suppliers. It will be rescinded as soon as the controversy is decided, or it will be modified if a reason is demonstrated.

### 13. *Conclusion.*

In the 207 years since the adoption of the Constitution, the people of this country have frequently failed to live up to the ideals of our Founding. The governments of this country have as often failed to live up to their responsibilities under the system the people adopted. Despite the equivocations, abandonments, regressions, and temporizing, America still has its ideals, and its governments still have their responsibilities. We must keep working; that work must not be a new wrong. The means and the end must be constitutionally legitimate.

The historical wrongs to the members of ethnic groups was real and despicable. The consequences of those wrongs are a tragic part of our social fabric today. The evolution of the role of women in our society has been liberating for both women and men. Our discovery that cherished traditions about differing capabilities and suitabilities by sex were dead wrong allowed us to rise above mere community and honor the individual.

Some contractors are being denied the opportunity to compete for Metro contracts equally with other contractors; the distinction between them is wholly unconnected to the purpose of furnishing transportation facilities and transportation to the Houston metropolitan region.

After the facts are determined, it may well be that the contractors will lose because they turn out not to have met the jurisdictional requirement for standing. In the meantime, this case must proceed until the actual practice of Metro has been determined and the actual effect of its practices has been ascertained. The contractors have shown ample direct evidence of injury to deflect Metro's preemptory strike at jurisdiction and to obtain preliminary relief.

### PRELIMINARY INJUNCTION

### 1. *Hearing.*

On Thursday, April 18, 1996, the court held a hearing on the Houston Contractors Association's application for a preliminary injunction in this action seeking a declaration that the Metropolitan Transit Authority of Harris County's Disadvantaged Business Enterprise program is unconstitutional.

### 2. *Parties.*

A. The plaintiff is Houston Contractors Association.

B. The defendant is Metropolitan Transit Authority of Harris County.

### 3. *Reasons.*

Injunctive relief is appropriate because evidence indicates preliminarily that Metro's DBE program discriminates unconstitutionally against non-qualifying contractors and sub-contractors. The court finds these to be reasons to grant injunction relief:

### A. *Likelihood of Success.*

Metro's program as it is written and administered appears to violate the constitutional right to equality of opportunity of the members of the Houston Contractors Association because it directly and indirectly allocates governmental contract rights based on sex and race. The contractors association is likely to succeed at the trial in establishing the facts and law that compel suspension of Metro's DBE program.

### 6. *Bond.*

Houston Contractors must file a bond in the principal of $50,000 for the injunction to remain effective.

### 7. *Signing.*

Rendered and signed April 22, 1996, at 2:04 p.m.

#### CLARIFICATION ORDER

The injunction is entirely prospective.

The injunction requires no change to solicitations, bids, acceptances, sub-contracts, or contracts as they existed on April 22, 1996. It requires Metro not to receive sex and race information or to consider sex and race when making decisions. Metro and the Houston Contractors Association are expected to honor their commitments.

If Metro manipulates pending contracts or accepted bids to retaliate against the Houston Contractors, that will be addressed after the fact.