**ADVENTURE COMMUNICATIONS, INC.,** a West Virginia Corporation, Gateway Communications, Inc., a Delaware corporation, Harvit Broadcasting Corporation, a West Virginia corporation, Media, Inc., a Delaware corporation, Lee Enterprises, Inc., a Delaware corporation, and Sullivan Broadcasting of West Virginia, Inc., a Delaware corporation, Plaintiffs,

v.

**KENTUCKY REGISTRY OF ELECTION FINANCE, Defendant.**

Civil Action No. 3:96–0938.

United States District Court,
S.D. West Virginia,
Huntington Division.

Nov. 4, 1998.

David Allen Barnette, Christopher L. Callas, Monika J. Hussell, Charleston, W.Va., for plaintiffs.

George E. Carenbauer, Jace H. Gans, Charleston, W.Va., Sheryl G. Snyder, Richard Belilors, Louisville, Ky, for defendant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the Court are briefs appearing to be cross-motions for summary

judgment. The plaintiffs, each corporate entities operating outside of Kentucky, request that this Court enter judgment declaring that they are exempt from a Kentucky statutory scheme that requires broadcasters to report receipts of funds received on behalf of Kentucky gubernatorial candidates. This Court **FINDS** that the Kentucky statutory scheme, if applied to the plaintiffs, would improperly extend the Commonwealth's sovereign power beyond its territorial boundaries. Accordingly, the Court hereby **GRANTS** summary judgment in favor of the plaintiffs and **DECLARES** that the Commonwealth of Kentucky lacks the legislative power to apply Section 121.180(11) of the Kentucky Revised Statutes to the plaintiffs.

## I. Background

Kentucky has suffered several campaign scandals recently that have resulted in the convictions of more than a dozen public officials and lobbyists. Stipulation of Facts No. 7. To combat this problem, and to help restore the public's confidence in its election process, Kentucky's General Assembly has enacted major campaign reform legislation. *Id.* As part of that reform, Kentucky authorized partial public financing of gubernatorial and lieutenant gubernatorial elections, whereby gubernatorial slates (comprised of candidates for Governor and Lieutenant Governor) can obtain public financing in return for their promise that they will accept no more than $600,000 in private contributions per primary or general election. Stipulated Ex. A at 2. The Commonwealth matches private contributions to participating slates on a two-to-one basis.[1] *Id.* Thus, slates participating in the program voluntarily accept a total spending limit of $1.8 million per election. *Id.*

Kentucky does not require its gubernatorial slates to bind themselves to the $1.8 million limit, but the statute offers strong incentives. Br. of Kentucky Registry at 4. If a participating slate's non-participating opponent spends in excess of $1.8 million, the participating slate's spending and contributions caps are lifted, and matching grants from the state's public funds are given even above the $600,000 limit. *Id.*

Kentucky employs a strict reporting procedure to police campaign expenditures under the system. Candidates, political action committees, and individuals must all report their expenditures, and all paid political advertisements must disclose the identity of their financial sponsors. *Id.* Additionally, the statute required media outlets to report all sales of political advertising.[2] *Id.* at 5. These latter reports were to include information about the advertising space, time, and services purchased by candidates, as well as information relating to the "independent expenditures" made by political action committees or individual citizens. *Id.*

To comply with the reporting requirements, media entities that sold advertising space, time, or services to candidates were required to complete a one-page form identifying the purchaser, the candidate slate, and the source of funds used to make the purchase. *Id.* The media entities were also to

---

1. A "contribution" includes any third-party expenditure made on behalf of a candidate and coordinated with the candidate's authorized representatives. Br. of Kentucky Registry at 4.

2. The text of the statute as it was originally enacted provides that:

> (11) Any publisher of newspapers or magazines, owner or lessor of billboards, a radio or television station or network, or any other person, company, corporation, or business organization offering its communications or advertising services for hire to the public who receives funds for the purchase of advertising services or material, shall file with the registry a copy of the material or communication purchased which supports or opposes any slate of candidates or committee; a copy of the receipt for

the funds paid; the name and address of each purchaser; and the source of the funds for the purchase if different than the purchaser. All information shall be reported to the registry on the thirtieth day preceding and the thirtieth day following the primary and regular elections subsequent to the date that the broadcasting or printing of the advertisement occurs. The provisions of this subsection shall apply only to purchases of advertising services or material to support or oppose a slate of candidates for election to the offices of Governor and Lieutenant Governor. Notwithstanding KRS 121.990 and KRS 121A.990, penalties for violation of this subsection shall be assessed in accordance with the provisions of KRS 121.140(2).

> Ky.Rev.Stat.Ann. § 121.180(11) (Michie Supp. 1997).

submit the original advertisement submitted to the media, a copy of the ad, or a transcript of its content. *Id.;* Stipulated Ex. H. These reports were to be filed within thirty days of each purchase and every thirty days thereafter, if further purchases were made. Stipulated Ex. H. During the final fifty-six days before an election, the reports were to be filed every fourteen days. *Id.* The reporting requirement applied to Kentucky's gubernatorial primary, general, and run-off elections. *Id.*

In 1998, the Kentucky Legislature amended the statute.[3] Radio and television stations are no longer specifically required to complete the one-page form and submit a copy or transcript of the advertisement. *Compare* 1998 Ky. Acts ch. 599, § 121.180(11)(a) (providing text of amended statute) *with* KY.REV. STAT.ANN. § 121.180(11) (Michie Supp.1997) (providing text of original statute). However, the amended statute still requires radio and television stations that receive funds from candidates for advertising services or

materials, to file related documentation[4] with the Kentucky Registry along with a cover letter from the station's manager or his designee. 1998 Ky. Acts ch. 599, § 121.180(11)(b). The documents and cover letter must be received by the Kentucky Registry or postmarked no later than 30 days after the elections that are held subsequent to the date of the printing or broadcasting of the applicable advertisement. *Id.*

The plaintiffs in this action are West Virginia-based licensed broadcasters (Broadcasters) which operate "the only over-the-air television stations affiliated with the major commercial television networks whose broadcasts reach a significant portion of Eastern Kentucky." Stipulation of Facts No. 13. Accordingly, "candidates for statewide political office in Kentucky routinely purchase advertising time during election campaigns on the [plaintiffs' stations]." *Id.* The plaintiffs "solicit business from candidates in [Kentucky's] statewide electoral contests" through marketing efforts directed at the candidates

---

**3.** The amended statute provides that:

(a) Any publisher of newspapers or magazines, owner or lessor of billboards, or any other person, company, corporation, or business organization offering its communications or advertising services for hire to the public who receives funds for the purchase of advertising services or material, shall file with the registry a copy of the material or communication purchased which supports or opposes any slate of candidates or committee; a copy of the receipt for the funds paid; the name and address of each purchaser; and the source of the funds for the purchase if different than the purchaser.

(b) A radio or television station or network that receives funds for the purchase of advertising services or material that supports or opposes a slate of candidates or committee shall file with the registry a copy of the documentation of paid political campaign advertisements that is required to be maintained by the Federal Communications Commission, along with a cover letter from the manager of the station or network or the manager's designee.

(c) All information required to be reported by paragraphs (a) and (b) of this subsection shall be in the hands of the registry or postmarked not later than the thirtieth day following the primary, runoff primary, and regular elections that are held subsequent to the date that the broadcasting or printing of the advertisement occurs.

(d) The provisions of this subsection shall apply only to purchases of advertising services or

material to support or oppose a slate of candidates for election to the offices of Governor and Lieutenant Governor.

(e) Notwithstanding KRS 121.990 and KRS 121A.990, penalties for violation of this subsection shall be assessed in accordance with the provisions of KRS 121.140(2).

1998 Ky. Acts ch. 599, § 121.180(11).

**4.** The Federal Communications Commission (FCC) mandates that stations retain certain documentation regarding paid political campaign advertising. The statute requires stations to supply those documents to the Kentucky Registry. The FCC regulations referenced in the statute provide that the plaintiffs must:

(a) . . . keep and permit public inspection of a complete and orderly record (political file) of all requests for broadcast time made by or on behalf of a candidate for public office, together with an appropriate notation showing the disposition made by the licensee of such requests, and the charges made, if any, if the request is granted. The "disposition" includes the schedule of time purchased, when spots actually aired, the rates charged, and the classes of time purchased.

. . . . .

(c) All records required by this paragraph shall be placed in the political file as soon as possible and shall be retained for a period of two years. As soon as possible means immediately absent unusual circumstances.

47 C.F.R. § 73.1943 (1997).

themselves and their in-state and out-of-state agents. *Id.* During the 1995 primary and general Kentucky gubernatorial elections—the first elections conducted after the enactment of the statutory reporting scheme—the plaintiffs received approximately $267,202 in advertising revenues from or on behalf of Kentucky candidates. Stipulation of Facts No. 14. None of the plaintiffs fully complied with Kentucky's reporting requirements, although several of the plaintiffs provided partial information to the Kentucky Registry. Stipulation of Facts No. 21. In 1996, the plaintiffs filed this action seeking a declaratory judgment that they are exempt from Kentucky's reporting requirement.

The plaintiffs argue that the Kentucky Registry lacks jurisdiction over the Broadcasters to enforce Kentucky's statutory scheme. They also allege that Kentucky's application of the scheme to them violates the First Amendment and Commerce Clause of the United States Constitution and the Due Process Clauses and equal protection provisions of the United States and West Virginia constitutions.

## II. Summary Judgment

Summary judgment is warranted when no genuine issues of material fact exist and the moving party proves that it is entitled to judgment as a matter of law. *Binakonsky v. Ford Motor,* 133 F.3d 281, 285 (4th Cir.1998) (citations omitted). Summary judgment is justified when the Court is satisfied from the totality of the evidence presented, including the pleadings, depositions, answers to interrogatories, and affidavits, that no genuine factual issues remain for trial and that the moving party is entitled to judgment as a matter of law. *Sylvia Dev. Corp. v. Calvert County, Md.,* 48 F.3d 810, 817 (4th Cir.1995) (citing Fed.R.Civ.P. 56(c)).

Although neither party has formally invoked Rule 56 of the Federal Rules of Civil Procedure, the Court finds this action susceptible to summary judgment adjudication. At the first conference conducted in this action, the parties agreed that the central issue of the case presented purely a legal question susceptible to summary judgment resolution. Based upon this agreement, the Court instructed the parties to discuss whether they could stipulate to the material facts, and, if so, to file cross-motions for summary judgment. In compliance with the Court's instructions, the parties jointly filed with the Court a document entitled, "Stipulation of Facts." This document, which contains seventy-six (76) separate stipulations and twenty-seven (27) supporting affidavits and other exhibits, sets out all material facts essential to the Court's proper understanding and adjudication of this action. The parties also filed with the Court separate "briefs" arguing the merits of their positions. Additionally, after the Kentucky General Assembly amended the challenged statute, the Court asked the parties to address five additional issues. Given this procedural history, the parties' failure to reference Rule 56 in their pleadings does not render summary judgment inappropriate.

## III. Mootness

█ In its request for supplemental briefs, the Court asked each side whether or not recent amendments to the statute had rendered the case moot. The defendants argue that no case or controversy remains because the statute that was the basis of the plaintiff's original claim has been repealed and because the Kentucky Registry has not attempted to enforce the *amended* statute against the plaintiffs. Supp.Br. of Def. at 2–6, 7–10. The plaintiffs argue that the statute still authorizes Kentucky to prosecute activities occurring entirely outside its borders and that the Kentucky Registry has not abandoned its claim that the plaintiffs failed to comply with the prior statute. Supp.Br. of Pl. at 2–3.

█ A case becomes moot when it loses "its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972) (per curiam) (quoting *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)). Nonetheless, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of*

*Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). Thus, a case becomes moot upon an alteration of a statute or challenged practice only if such subsequent events make "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assoc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). If not for the Court's retention of power, "a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). The issue, therefore, is "whether the new ordinance is sufficiently similar to the repealed ordinance that it is permissible to say that the challenged conduct continues." *Id.* at 662 n. 3, 113 S.Ct. 2297.

In this case, the plaintiffs challenge the Kentucky Registry's initial attempt to regulate—with threats of financial penalty—acts occurring entirely outside the borders of Kentucky. Although Kentucky's amendments to the statute reduced the plaintiff's burdens,[5] the statute continues to force the plaintiffs' compliance. The challenged conduct remains viable despite the revisions to the statute; thus, the case is not moot. *See Northeastern Fla. Chapter*, 508 U.S. at 662, 113 S.Ct. 2297 (declining to find case moot when revised statute disadvantaged plaintiffs to lesser degree than original, because new statute still disadvantaged them in same fundamental way as original statute). Additionally, to the extent that the Kentucky Registry has not abandoned its claim that the plaintiffs failed to comply with the prior statute, the controversy remains a live one suitable for adjudication.

## IV. Extraterritorial Enforcement of State Legislation

■ The plaintiffs in this case are not domiciled in Kentucky, are not authorized to do business within Kentucky, pay no corporate income tax in Kentucky, own no real property in Kentucky, and have sold advertising services only to non-Kentucky-based media buyers. Stipulation of Facts Nos. 1–6, 35–37, 44–46, 51–53, 57–59, 63–65, 73–75. Nonetheless, the challenged Kentucky statute requires the plaintiffs to copy portions of their FCC political files, write cover letters, and send the information to the Kentucky Registry, or be subject to fines. 1998 Ky. Acts ch. 599, § 121.180(11)(b). The plaintiffs argue that insofar as their regulated conduct occurs wholly outside of the territorial borders of Kentucky, the Due Process Clause of the Constitution prohibits the Commonwealth to make and enforce its laws against them and to regulate their actions.

■ From the pleadings, it seems that the parties agree that a state cannot criminalize purely extraterritorial activity. Indeed, it is inherent in the very structure of our federalist government that a state's power necessarily ends at its territorial borders. *See Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) ("[A]ny attempt 'directly' to exert extraterritorial jurisdiction over persons or property would ... exceed the inherent limits on the State's power."); Seth F. Kreimer, *"But Whoever Treasures Freedom ...": The Right to Travel and Extraterritorial Abortions*, 91 MICH. L.REV. 907, 921–22 (1993) ("State courts from the founding of the Republic through the framing of the Fourteenth Amendment denied power of states to prosecute for wholly extraterritorial acts.... The American Constitution acknowledges exclusive state sovereignty over conduct within the territories defined by state borders. Many aspects of the constitutional structure would make no

**5.** Arguably, one can read Subsection (a) to apply the plaintiffs. Subsection (a) of the amended statute applies to "any other person, company, corporation, or business organization offering its communications or advertising services for hire to the public who receives funds for the purchase of advertising services or material." 1998 Ky. Acts ch. 599, § 121.180(11)(a). Though it no longer refers specifically to a "radio or television station or network" like the previous statute, the plaintiffs still fall within the group specified by Subsection (a). The Court focuses its analysis on the requirements in KRS 121.180(11)(b) because that subsection specifically applies to radio and television stations. *Id.* at § 121.180(11)(b).

638

sense otherwise."); Andrew J. Reis, Note, *Extraterritoriality of Restrictive State Abortion Laws: States Can Abort Plans to Abort at Home But Not Abroad,* 70 WASH.U.L.Q. 1205, 1211–12 (1992) ("The doctrine of territoriality constitutes one of the oldest elements of American and English criminal law. The principle grants a state the authority to punish crimes committed within its territorial limits, but prohibits a state from controlling conduct that occurs outside its borders.") (footnotes omitted). Once assumed from the notion that crimes constitute local affairs, *see* Reis, 70 WASH.U.L.Q. at 1212 (locating roots of territoriality doctrine in notion that crimes are local); Richard W. Smith, Note, *Interpreting the Constitution from Inside the Jury Box: Affecting Interstate Commerce as an Element of the Crime,* 55 WASH & LEE L.REV. 615, 639 (1998) ("Enforcement [of criminal laws] historically has been a matter primarily local in nature, an understanding dating back to the original colonists."), the notion that a state may not punish wholly extraterritorial conduct that it defines as criminal is now intimately bound up in the citizenry's right to due process. *See Allstate Ins. Co. v. Lavina Hague,* 449 U.S. 302, 334, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (Brennan, J., dissenting) ("Both the Due Process and Full Faith and Credit Clauses ensure that the States do not 'reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'") (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In fact, the time-honored tenet is the basis upon which many of our constitutional freedoms in part depend. *See* Kreimer, *supra,* at 922 (citing the Privileges and Immunities Clause and the Extradition Clause).

The conduct sought to be regulated by the Kentucky statute is undoubtedly extraterritorial conduct. Through the application of its laws, Kentucky attempts to regulate the extraterritorial documentation and reporting of purchases and sales of air time on out-of-state stations. Although the air time purchased and sold is for advertisements relating to Kentucky's elected offices and may in some cases be made by agents of Kentucky residents, it is not the marketing, purchases,

or sales that is regulated. The defendants reach the same conclusion. *See* Br. of Def't at 15 ("The Reporting Requirement merely requires the Broadcasters to report the financial transactions by which candidates purchase advertisements broadcast into Kentucky. *It does not 'regulate' the contractual relationship between the Broadcasters and the advertisers, nor does it regulate the advertising.*") (emphasis added). The actual conduct that Kentucky seeks to proscribe is the broadcasters' failure to copy and deliver their FCC files and failure to write and attach a cover letter, and that activity occurs entirely outside of Kentucky. The broadcasters are all located entirely outside of Kentucky. No part of their documentation and reporting activities takes place within the borders of Kentucky.

Having conceded that state power is inherently limited so that a state cannot criminalize purely extraterritorial activity and that the plaintiffs' activity is entirely extraterritorial, Kentucky Registry nonetheless asserts that it may regulate the plaintiffs' activity as long as the plaintiffs have established certain "minimum contacts" with the state. The plaintiffs admit that they have established such "minimum contacts" with Kentucky, therefore, the Registry argues, the Commonwealth's regulations should apply to the plaintiffs' out-of-state activity.

The Registry's argument confuses the "minimum contacts" with a state that may fairly substitute for presence when a state seeks to assert *adjudicatory* jurisdiction with the actual presence within the state that is required when the state seeks to assert *legislative* authority. The Registry argues that the defendant's activity must be considered to be within Kentucky and therefore subject to the legislative authority of the state simply because the defendant could be subjected to adjudicatory jurisdiction there.

■ While clever, the Registry's position is not supported by the law. Though a state, under the circumstances of a particular case, may properly assert adjudicative jurisdiction and require foreign entities to respond in its courts to allegations made in civil suits, that power is not necessarily coexten-

sive with the state's power to assert legislative jurisdiction and regulate the day-to-day affairs of the foreign entity. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 319, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (Scalia, J., concurring) (stating that due process standards for adjudicative jurisdiction are not necessarily identical to legislative jurisdiction). Legislative jurisdiction extends over wrongs against the state and "involves state regulation of an individual's out-of-court activities," Brilmayer et al., *supra* at 775; *accord* Reese, *supra* at 1587, but adjudicative jurisdiction is required to address wrongs against individuals and "implicates the state's right to compel an individual to defend litigation in its courts and to comply with its procedures for resolving disputes." Lea Brilmayer et al., *A General Look at General Jurisdiction*, 66 Tex. L.Rev. 721, 775 (1988); *accord* Willis L.M. Reese, *Legislative Jurisdiction*, 78 Colum.L.Rev. 1587, 1587 (1978). Consistent with federalism and due process,[6] "[a] state's [legislative] sovereign authority over persons, property, and activities" is strictly confined to "its territorial limits, and its laws have no operation in other states except as allowed by those states or by comity," *Stover v. O'Connell Assoc., Inc.*, 84 F.3d 132, 136 (4th Cir.1996); *see also Shaffer*, 433 U.S. at 197, 97 S.Ct. 2569 ("[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power."); *Bigelow v. Virginia*, 421 U.S. 809, 822–24, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (prohibiting Virginia legislature from regulating activities occurring in New York), *Nielsen v. Oregon*, 212 U.S. 315, 321, 29 S.Ct. 383, 53 L.Ed. 528 (1909) (finding that Oregon cannot prosecute and punish act done within territorial limits of Washington); *Bonaparte v. Tax Court*, 104 U.S. 592, 594, 26 L.Ed. 845 (1881) ("No state can legislate except with

reference to its own jurisdiction."), but the state's adjudicative authority to assert jurisdiction extends more broadly to reach those defendants who have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

The Registry argues that "the pervasiveness with which the Broadcasters do business in Kentucky simply cannot be ignored in determining whether the Broadcasters have 'minimum contacts' with Kentucky." Br. of Def. at 12. The Registry further argues that "the political consultants with whom Broadcasters contracted were acting as authorized agents of Kentucky candidates when they bought the advertisements, and the contracts expressly purchased advertising intended to be broadcast into Kentucky." *Id.* Finally, the Registry argues that "even if the contracts for the purchase and sale of advertisements were the only contacts involving Broadcasters with Kentucky, they would provide sufficient minimum contacts to satisfied (sic) due process." *Id.* at 13. The Registry's arguments each address the sufficiency of plaintiffs contacts with Kentucky for the assertion of adjudicatory jurisdiction. Despite the frequency of the plaintiffs' contacts with Kentucky, however, Kentucky simply does not have the legislative sovereign authority to require a West Virginia citizen to comport with Kentucky's criminal laws when conducting activity that occurs totally outside the Commonwealth.

▉ The Registry's remaining argument is substantially similar. The Registry argues that Kentucky has the power to impose regu-

---

**6.** The plaintiffs correctly argue that they are entitled to due process notice before the legislature may enforce laws applicable to them. Defendants characterize the argument as an "extraordinary," "audacious proposition" for which there is no authority. While it is generally true that ignorance of the law is no excuse for a violation thereof, the maxim should not be overstated: it is a judicial fiction that removes the state's due process burden of proving that individual defendants had actual knowledge of the

law which they are charged with violating. When a state seeks to extend its sovereign power beyond its territorial borders, a wholly different problem arises. The defendant cannot be charged with knowledge of foreign laws, to the authority of which he has not consented, and for which his representatives have not voted. The defendants seek to charge nonresidents with knowledge of the full panoply of every state's laws, and worse yet, to hold those nonresidents responsible for violations thereof.

lations addressing the harm arising from the failure to file reports insofar as the harm affects the health, safety, and welfare of its citizens and is felt within Kentucky. While this Court may be inclined to agree with the Registry if it had demonstrated that the plaintiffs' *contacts with the state* caused harm therein, under the facts presented, any harm created by the failure to file reports in Kentucky arises solely from the plaintiffs' extraterritorial refusal to file reports. To allow the Kentucky Registry to fine the plaintiffs for failing to *extraterritorially* document and report purchases and sales of air time on out-of-state stations would be to allow the Kentucky General Assembly to cry foul and claim injury arising out of a failure to create a contact with the state rather than an actual contact. To the extent that the plaintiffs' actual contact with the state of Kentucky creates harms in the state, Kentucky may regulate those activities, but the Kentucky legislature cannot criminalize a failure to create further contacts with a state and define that failure as activity occurring within the state.

The Court notes that its ruling does not frustrate the main objective of the challenged statute—obtaining information from media entities with which to "cross-check" candi-

dates' reports about their advertising purchases. The FCC mandates that the political files which the broadcasters must keep "shall be available for public inspection at any time during regular business hours," *Id.* at § 73.3526(d), and that "[c]opies of any material required to be in the [political] file ... shall be available for machine reproduction upon request made in person, provided the requesting party shall pay the reasonable cost of reproduction." *Id.* at § 73.3526(f). Thus, a representative from the Kentucky Registry may walk into a broadcaster's studio at any time during regular business hours, and request copies of every document maintained in the station's political file.[7] The broadcaster must fulfill this request within seven days, provided that the Kentucky Registry pays the broadcaster the reasonable cost of reproducing the requested material.[8] Clearly, through the FCC regulations, Kentucky retains the ability acquire the necessary information from the plaintiffs and achieve its laudable goals. However, in its effort to shortcut the FCC regulations through KRS 121.180(11), Kentucky exceeded its legislative authority.

For the reasons set forth above, the Court hereby **GRANTS** summary judgment in favor of the plaintiffs and **DECLARES** that

---

7. The Court is aware that on September 16, 1998, the FCC adopted amendments to its public inspection file requirements. Main Studio and Public Inspection File of Broadcast Stations, 63 Fed.Reg. 49,487 (1998). The amended version of section 73.3526 states:

> (c) Access to material in the file. (1) The file shall be available for public inspection at any time during regular business hours. All or part of the file may be maintained in a computer database, as long as a computer terminal is made available, at the location of the file, to members of the public who wish to use the review the file. Material in the public inspection file shall be made available for printing or machine reproduction upon request made in person. The applicant, permittee, or licensee may specify the location for printing or reproduction, require the requesting party to pay the reasonable cost thereof, and may require guarantee of payment in advance (e.g. by requiring a deposit, obtaining credit card information, or an other reasonable method). Requests for copies shall be fulfilled within a reasonable period of time, which generally should not exceed 7 days.
> (2) The applicant, permittee, or licensee shall make available, by mail upon telephone re-

quest, photocopies of documents in the file, and the station shall pay postage. Licensees shall mail the most recent version of "The Public and Broadcasting" to any member of the public that requests a copy. Licensees shall be prepared to assist members of the public in identifying they may ask to be sent to them by mail, for example, by describing to the caller, if asked, the period covered by a particular report and the number of pages included in the report.

*Id.* at 49,497–98. Under these revised regulations, Kentucky Registry need only telephone or write a letter to the plaintiffs in order to receive the information that it demands through KRS 121.180(11). These amendments only became effective on October 30, 1998. Main Studio and Public Inspection File of Broadcast Stations, 63 Fed.Reg. 56,578 (1998). Thus, the Court does not include the amended FCC regulations in its analysis.

8. In fact, pursuant to FCC regulations, any member of the general public may obtain copies of a station's political file simply by following the outlined procedure.

.

the Commonwealth of Kentucky lacks the legislative power to apply Section 121.180(11) of the Kentucky Revised Statutes to the plaintiffs. Accordingly, this action is hereby **DISMISSED** with prejudice.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record and any unrepresented parties.