UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 01-2039
(CA-98-1585-L)

_____

Rob Farmer,

Plaintiff - Appellant,

versus

David J. Ramsay, Doctor, et al.,

Defendants - Appellees.

_____

O R D E R

_____

The court amends its opinion filed August 1, 2002, as follows:

On page 10, first paragraph, line 3 -- "recommendatio" is corrected to read "recommendation."

On page 10, first paragraph, line 9 -- "the district cor- rectly" is corrected to read "the district court correctly."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

ROB FARMER,
　　　*Plaintiff-Appellant,*

　　　v.

DAVID J. RAMSAY, Doctor; DONALD
E. WILSON, Doctor; MILFORD M.　　　No. 01-2039
FOXWELL, JR.; UNIVERSITY OF
MARYLAND AT BALTIMORE;
UNIVERSITY OF MARYLAND SCHOOL OF
MEDICINE,
　　　*Defendants-Appellees.*

Appeal from the United States District Court

for the District of Maryland, at Baltimore.

Benson E. Legg, District Judge.

　　(CA-98-1585-L)

　　Argued: April 3, 2002

　　Decided: August 1, 2002

Before NIEMEYER, KING, and GREGORY, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Judge Niemeyer and Judge King joined.

_____

COUNSEL

**ARGUED:** John Willard Montgomery, Washington, D.C., for Appel-
lant. Dawna Marie Cobb, Assistant Attorney General, Baltimore,

Maryland, for Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

### OPINION

GREGORY, Circuit Judge:

Appellant, Rob Farmer, appeals the district court's order granting summary judgment in favor of Appellee, the University of Maryland School of Medicine. Farmer claims that the University's race-conscious admissions process is inconsistent with the Equal Protection Clause of the United States Constitution. For reasons that follow, we affirm the judgment of the district court.

### I.

As the district court found, there is substantial evidence that the University of Maryland School of Medicine (UMSM) considers race during the admissions process. Cognitive factors, primarily grade point average (GPA) and Medical College Admissions Test (MCAT) scores, are the most important criteria for admission, but the school also considers "non-cognitive" factors, such as letters of recommendation, family background, work history, personal statements, and race.[1]

_____

[1] The record does not suggest the use of any rigid formula for determining the relative weight of race or other non-cognitive factors. Moreover, there is no evidence that UMSM segregates applications into different tracks based on race, sets aside a specified number of spots for minorities, or operates under an express quota system. It is enough, for purposes of this appeal, to accept the Appellant's assertion that cognitive factors are the most important considerations for admission, and that race also plays an important role as a non-cognitive factor.

2

Like many universities, UMSM processes applications through a series of stages, weeding out unqualified candidates at each stage. Candidates who survive the early stages are given a personal interview, and the process culminates in a vote by the admissions committee. At the first stage, applicants complete a standard American Medical College Admissions Service application form. Applicants may, if they so choose, identify their race on this form. These preliminary applications are filtered by residency, GPA, and MCAT scores. Applications from Maryland residents are almost invariably sent to the second stage. Many other applications, however, are culled from the pack at the first stage. In the second stage, applicants complete a lengthier application, which includes the submission of letters of recommendation and personal statements, as well as GPA and MCAT scores. Each application is assigned to a member of the admissions committee, who presents the application to the full committee along with a recommendation whether the applicant should be interviewed. Each member of the admissions committee receives a report including the applicant's grades, MCAT scores, undergraduate and graduate institutions attended, degrees earned, age, race (if provided by the applicant), and residency. The committee members consider this information as well as the remaining non-cognitive factors, *see ante* at 2. The full committee then votes to grant the applicant an interview, or to reject the applicant without an interview. After the selected applicants are interviewed, the applicant's full application is presented again to the admissions committee, which votes to either reject the application or offer admission.

Farmer, a white male, applied to UMSM three times—in 1994, 1995, and 1996—and was rejected without an interview each time. Disappointed by his rejection, Farmer filed suit, alleging that UMSM's race-conscious admissions policy was unconstitutional. Farmer limited his challenge to the rejection of his 1995 application—that being his strongest application.

Farmer's 1995 application revealed, as the district court noted, that Farmer spent the nine years following his high school graduation rock climbing, hitchhiking, and juggling. In 1987, at the age of 27, Farmer enrolled at the University of Colorado, Boulder. Farmer was uninterested in medical school at the time, and took few science courses. After graduating in 1991, Farmer moved to Maryland to work for his

3

father repairing houses. The district court noted that this was the only paid employment Farmer listed on his application. In 1994, Farmer began pursuing a medical career.

Farmer lacked the minimum number of science courses to apply to UMSM. Consequently, from 1992 to 1993, he took science courses at Towson University. Farmer earned a science GPA of 2.8, and he received "C" grades in several classes, including Basic Math and Science, General Chemistry, Organic Chemistry, and Immunology.[2] In April 1994, Farmer took the MCAT for the first time. He concedes his scores were poor. When he took the MCAT a second time, he greatly improved his score.[3]

In 1995, Farmer was one of 4,466 applicants seeking one of approximately 140 available places in the Fall 1996 entering class. Of the 4,466 applicants, 518 were offered interviews and of those, 299 were offered admission and 144 matriculated. The overall rate of admission was 6%. Fifty-six black students were offered admission to UMSM's Fall 1996 class; twenty-eight black students chose to attend.

_____

[2] Farmer's experts stated that the average science GPA for minority admittees to UMSM was 3.32. The average science GPA for non-minority admittees was 3.63. J.A. 1414.

[3] On the 1994 MCAT, Farmer received the following scores: Verbal reasoning — 11 (85-96 percentile), Physical sciences — 6 (13-27 percentile), Writing Sample — P (63-75 percentile), and Biological sciences — 7 (24-37 percentile). In 1995, Farmer received the following scores: Verbal reasoning — 10 (75-87 percentile), Physical science — 10 (74-86 percentile), Writing sample — S (96-99 percentile), and Biological sciences — 9 (56-72 percentile).

From these data and the data that Farmer obtained in discovery, Farmer's experts generated "composite" scores. Farmer's composite score on his first MCAT was 38. Farmer's composite score on his second MCAT was 49. The average composite MCAT score for all admittees was 44.92. J.A. 1402. The average composite MCAT score for minority admittees was 38.42. The average MCAT for non-minority admittees was 46.67.

The average GPA for all admittees is unclear from the record. The average GPA for preferred admittees was 3.46. The average GPA for non-preferred admittees was 3.64. J.A. 1414. Farmer's overall GPA was 3.41. J.A. 1401.

4

Because Farmer was a Maryland resident, his application automatically advanced to the second stage. Farmer's file included his rejected 1994 application, his second MCAT score, his undergraduate transcript, his employment history, a second letter of recommendation from Towson University, other personal information (such as his misdemeanor arrest record) and additional personal statements. Hermione Hicks, the Director of Recruitment for the Office of Admissions at UMSM, presented Farmer's 1995 application to the admissions committee. Hicks noted that Farmer had not held a "significant job" as an adult and had spent "an extreme amount of time" involved in purely recreational activities. Hicks recommended against giving Farmer an interview. The admissions committee voted 14-0 to reject Farmer without an interview.

During discovery, Hick's and other committee members' deposition testimony was that race played no part in the decision to reject Farmer. They testified that Farmer's application was rejected because of (1) the cool letter of recommendation from Towson University, (2) his relatively low GPA from Towson, (3) his less than average and inconsistent MCAT scores, (4) his quirky personal statements, (5) his sparse employment history, and (6) the inconsistent explanations Farmer gave for his arrest record.

During the admissions committee's evaluation of Farmer, Ms. Hicks read to the committee a portion of the Towson letter of recommendation, which she found to be very unsupportive of Farmer:

> We greatly respect his interest in the humanities, environmental issues and human rights, but have had concerns about whether his personality and somewhat inconsistent academic performance would lend themselves to the conventions of the medical profession that he hopes to enter.

J.A. 174-175. The admissions committee, familiar with the care with which letters of recommendations are written, understood this to be a very poor recommendation. Every member of the admissions committee who voted on Farmer's application has attested that the Towson letter was fatal to Farmer's application because it raised questions about his personality and fitness for a medical career. J.A. 240-263; 359-360; 370; 516-521; 550; 722-723; 811-812.

5

The admissions committee was also concerned about Farmer's personal statements. These statements revealed negative feelings about the medical profession. In one statement, quoting from the cartoon "Calvin and Hobbes," Farmer stated that doctors should "be careful or be roadkill." Farmer also described how, at age nine, he fell out of a tree and broke his arm. According to Farmer, his doctor "pronounced [him] crippled for life—a terrible falsehood to tell a nine-year old boy." Farmer also wrote that "perhaps most doctors have not read any new medical information in the last 12 years." He further stated that "from a very unscientific poll, [he has] determined that nearly everyone has a horror story to tell about a doctor."

Returning to his personal experiences with physicians, Farmer wrote about (1) the "absence of compassion" and "ignorance" of a doctor treating his mother, (2) the incompetence of another physician treating a friend for abdominal pains, (3) the "substandard" care received by a friend's wife during nasal surgery, (4) the lack of "common sense" of his own childhood physician, and (5) the "crooked bone in [his] hand" caused by another physician's incompetence.

Finally, Farmer used his personal statements to disparage his fellow applicants to medical school. He wrote: "Most of the pre-med students I've seen are very good at rote memorization, but they often fall woefully short in areas of common sense, assertiveness, social concern, and knowledge of current events." In another statement, Farmer wrote, "[m]ost of your prospective students are essentially interchangeable units; if one student doesn't fill a need somewhere, someone else will fill that need . . . . This is why it is so important that you accept me." According to the uncontroverted deposition testimony of Ms. Hicks and another committee member, Associate Dean Milford Foxwell, the admissions committee felt that Farmer's personal statements reflected hostility to the medical profession and condescension to his prospective classmates. The committee believed that these views made Farmer a poor candidate for admission.[4]

_____

[4] As noted above, Farmer's various applications gave different explanations for his arrest record. On his 1994 application, Farmer wrote that he had been convicted of criminal mischief after being "unjustly accused of damaging a window screen." Farmer also wrote that he failed to appear

6

After being rejected by UMSM again the following year, Farmer spent two years at Saba University's medical school in the Netherlands Antilles, after which he dropped out of medical school entirely.

### II.

Farmer's complaint and amended complaint alleged claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; 42 U.S.C. §§ 1983 and 1981; and directly under the Fourteenth Amendment's Equal Protection Clause. Farmer sought money damages, an order requiring the medical school to admit him, and a permanent injunction against future use of a race-conscious admissions policy.

After substantial discovery, UMSM moved for summary judgment, arguing that there was no genuine issue of material fact because even if race had not been a factor in admissions decision-making, Farmer would not have been admitted. UMSM also moved to exclude both of Farmer's experts. The district court granted the motion for summary judgment. The district court also excluded both experts—one because the expert's contingent fee arrangement violated Maryland "public policy," and the other because she was unqualified to render an expert opinion. Finally, the district court concluded that Farmer did not have standing to pursue forward-looking injunctive relief. Farmer filed this appeal.

### III.

We review a grant of summary judgment *de novo*, employing the same standards employed by the district court. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1127-28 (4th Cir. 1987). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56. The party moving for summary judg-

_____

to answer a charge of "illegal dogwalking." On his 1995 application, Farmer claimed that he had merely "once pled `no contest' to something like 4th degree trespassing." Attempting to clarify, Farmer further explained that "the woman against whom [he] allegedly trespassed later became [his] girlfriend."

7

ment bears the initial burden of pointing to the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[5]

Under the established law of equal protection, "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Texas v. Lesage*, 522 U.S. 18, 20-21 (1999). According to UMSM, Farmer would not have been admitted to the medical school if the admissions process had been race-neutral. As the above recitation of the uncontested facts demonstrates, we think UMSM has met its burden of demonstrating the absence of a genuine issue of material fact; viewing the evidence in the light most favorable to Farmer, a reasonable finder-of-fact could only conclude that Farmer would have been rejected absent the allegedly forbidden consideration.

Farmer's attempts to rebut UMSM's showing of the absence of a genuine issue of material fact fall short. Most of his argument on appeal has been dedicated to convincing us that race plays a significant role in admissions. As we stated at the outset, we take that as given. But the fact that race plays a major role *in general* is insufficient to create a genuine issue of material fact as to whether *Farmer* was injured by UMSM's admissions policy. In order to demonstrate that he was adversely affected, Farmer must be able to show that he was displaced by beneficiaries of racial considerations. Farmer argues that his GPA and MCAT scores were superior to several of the 56 black students who were offered admission. But that is insufficient to create a triable issue. Even if we were to assume that MCAT scores, GPA, and race were the *only* factors considered by the admissions

---

[5] We review a district court's decision to exclude an expert for abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 139 (1997). However, as will become clear, we find it unnecessary to decide whether the district court appropriately excluded Farmer's experts. Even considering the experts' proffered testimony, Farmer has failed to demonstrate a genuine issue of material fact.

8

committee, Farmer has failed to adduce any evidence that he was within the next group of 56 applicants that would have been admitted had the entire pool of 4,466 applicants been considered under a race-neutral policy. Indeed, even if we were to assume (and this is more than Farmer purports to show) that his GPA and MCAT scores were superior to *every* black student who was offered admission, Farmer has still failed to produce a single shred of evidence that he was within the next group of 56 applicants.[6] We simply do not know, even under these extraordinarily generous assumptions, how many other applicants were standing between Farmer and acceptance to the medical school. UMSM has said that under no circumstances would it have accepted Farmer, and we have been given no reason to doubt it.[7]

Moreover, even if Farmer was competitive with respect to cognitive factors, he fails to demonstrate that he was competitive in the other non-racial, non-cognitive factors. UMSM has come forward with sufficient evidence that the non-cognitive aspects of Farmer's

_____

[6] This is obviously a grossly excessive assumption, but it is difficult to derive a fairer approximation (to the medical school) from the limited record. Moreover, analysis of cognitive factors is not the entirely objective exercise that Farmer suggests it is. Not all GPAs are created equal. UMSM also considers the caliber of the institution at which the GPA was acquired.

[7] In the summer of 1995, Farmer participated in the Facilitation of Entry Program. This program is designed to help aspiring medical students improve their credentials. The program includes a free Kaplan MCAT preparation course. Farmer asserts that, by providing this program, UMSM is promising to accept any participant who improves their credentials into the medical school, and that UMSM's failure to admit him after he completed the program proves that he was denied admission because he is white. We are unable to find any support for this assertion in the record, much less sufficient support to warrant a trial. It is clear that Farmer's 1995 application was considered by the admissions committee after his completion of the summer program. For example, his 1995 letter of recommendation, which the admissions committee had before it at the time it voted to deny him an interview, is dated November 3, 1995, well after the summer program had ended. We simply do not find credible the assertion that UMSM would make such a conditional promise prior to making a full review of the applicant's entire application. And, of course, UMSM flatly denies making any such promise.

9

application precluded admission. Every member of the admissions committee has sworn that certain non-cognitive, non-racial factors—most specifically the letters of recommendation—were fatal to Farmer's application. Farmer has provided no evidence to rebut the deposition testimony of the committee members. For this reason as well, there is no genuine controversy over whether Farmer would have gained admission had the process been entirely color-blind.[8] Because Farmer has failed to rebut UMSM's demonstration of the absence of a genuine issue of material fact, the district court correctly granted UMSM summary judgment with respect to retrospective relief.

IV.

Farmer next argues that the district court erred when it found that he did not have standing to pursue a permanent injunction barring UMSM from considering race in the admissions process. The only dispute is whether injury-in-fact exists for Farmer to pursue forward-looking relief. In order to maintain a claim for forward-looking relief, Farmer must allege that use of a race-conscious admissions policy in the future constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

_____

[8] Farmer also argues that the district court erred in ruling that his § 1981 count did not state a claim. Title 42, Section 1981 "guarantees to all persons in the United States the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The district court ruled that Farmer, being white himself, could not state a claim under the section. This ruling would seem to be unassailably correct based on the plain language of the statute, but apparently it is not. In *L.N. McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), the Supreme Court held that § 1981 prohibited discrimination against a white person in favor of a black person. *Id.* at 285. However, the medical school accurately points out that § 1983 is the exclusive remedy for violations of § 1981 by state actors. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989); *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). Accordingly, Farmer has no cause of action based on § 1981 independent of § 1983. Of course, Farmer's § 1983 claim was dismissed by the district court's order granting summary judgment, which we affirm today.

10

While Farmer need not allege that he would have gained admittance to UMSM in order to establish standing, he does have to allege a real and imminent threat that he would suffer injury in the future. And the threat of injury must be particularized *as to Farmer*. *Adarand*, 515 U.S. at 211. In equal protection cases of this kind, the injury is the inability to compete "on an equal footing." *Id.* (quoting *Northeastern Florida Chapter, Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). Farmer has not, and will not, suffer such an injury. As the above discussion indicates, UMSM has adequately demonstrated that Farmer has not been exposed to any "discriminatory classification." *Id.* Notwithstanding his bare assertions to the contrary, Farmer was rejected because of, *inter alia*, an unsatisfactory letter of recommendation. The letter was unsatisfactory regardless of race. Or, to put it another way, Farmer was never actually treated differently on the basis of race. As for the future, it is beyond cavil that Farmer would be rejected for the same reason should he reapply to UMSM. Indeed, when Farmer reapplied to UMSM in 1996, Towson refused to give him *any* recommendation, stating that "serious reservations" precluded a letter of recommendation in support of Farmer's application. J.A. 72. Consequently, assuming that some white applicants to UMSM do not compete on equal footing, Farmer will not be exposed to any such inequality. In short, Farmer cannot show any "particularized" injury.

In addition, even if Farmer could show the threat of a concrete, particularized injury, he fails to demonstrate that UMSM's admissions policy will cause him "imminent" injury. *Id.* "Although `imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the injury is not too speculative for Article III purposes—that the injury is `*certainly* impending.'" *Lujan*, 504 U.S. 565 n. 2 (emphasis in original). In order to have standing, Farmer must make an adequate showing that "sometime in the relatively near future" he will again apply to UMSM and be subjected to an impermissibly race-conscious admissions process. *See Adarand*, 515 U.S. at 211. This he has not done. In the initial interrogatories propounded to Farmer, he admitted that he would not reapply to UMSM except as a transfer student. J.A. 266. It was not until UMSM moved for summary judgment, challenging Farmer's standing to pursue prospective relief, that Farmer insisted that he *might* reapply as a first year student. Farmer, in his reply brief, states

11

that he applied as a transfer student in 2001 (after the record had closed) and was rejected. It is not clear from the record whether race is a factor considered in the admission of transfer students. Thus, Farmer has not expressed an unequivocal intention to subject himself to a race-conscious admissions process. Consequently, Farmer has failed to show "imminent injury." Moreover, even assuming that race is a consideration in the admission of transfer students, UMSM stated at oral argument that the school does not accept transfers from Saba University. Again, because Farmer has failed to demonstrate that he will very likely be subjected to an allegedly unconstitutional admissions process, he does not have standing to pursue forward-looking relief. Accordingly, the district court correctly granted summary judgment to UMSM.

V.

For the reasons stated above, the judgment of the district court is affirmed.

*AFFIRMED*

12